**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Johnaton Sampson GEORGE,**
**Defendant–Appellant.**

No. 93–50744.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1995.

Decided June 2, 1995.

**1080**

Bernard G. Skomal, San Diego, CA, for defendant-appellant.

Mary A. Schneider, Asst. U.S. Atty., San Diego, CA, for plaintiff-appellee.

Before: CANBY and NOONAN, Circuit Judges, and KING,* District Judge.

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

SAMUEL P. KING, Senior District Judge:

Johnaton Sampson George appeals his conviction and sentence following a jury trial on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). George contends that the district court erred in (1) denying his motion for mistrial following the admission of certain hearsay evidence, (2) denying his motion for a new trial on the basis of alleged juror misconduct involving the use of a magnifying glass, (3) denying George's motion to represent himself, and (4) departing upward from the Sentencing Guidelines to sentence George to life in prison without parole. We have jurisdiction pursuant to 28 U.S.C. § 1291, and now affirm in part and reverse in part and remand.

## PROCEEDINGS BELOW

A one-count indictment was filed on April 1, 1992 charging George with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). A superseding indictment was filed on August 5, 1992. A second superseding indictment was filed on October 15, 1993, charging George with two counts of being a felon in possession of a firearm and one count of escape, in violation of 18 U.S.C. § 751(a). The first felon in possession count was tried to a jury, which returned a verdict of guilty. The escape count was tried to the court on stipulated facts, and the court found George guilty. The second felon in possession count was dismissed without prejudice.

The district court denied George's Motion for a New Trial and sentenced him to life in prison without the possibility of parole. George's timely appeal is now before this court.

## FACTS

A. *The Government's Case*

On December 10, 1990, George had a confrontation with Thomas Marks, the manager of an apartment complex where George's grandmother lived in San Diego. Marks had told George's girlfriend that she could not bring her dog into the building. Later the same day, Marks left the complex and was later informed that his office and apartment had been burglarized. Among the numerous items taken, according to a list Marks provided to police, was a Smith and Wesson .357 Magnum handgun owned by Marks.

On December 20, 1990, San Diego police arrested Carl Rundles in possession of Marks' stolen credit card. Police obtained a search warrant for Rundles' residence at 2114 Westland Ave. As they arrived to execute the warrant, police saw George and his girlfriend exiting the house and detained them. George told police that he was living at the residence off and on. When he was later booked, George gave Rundles' address as his own.

The police brought Marks to the residence so he could identify any stolen property belonging to him. Among the items was a briefcase Marks identified as belonging to him. The officers opened the briefcase and found Marks' .357 Smith and Wesson, some ammunition and other items inside. Marks also saw George and his girlfriend at the Westland house and told police he recognized them as the persons he had confronted on December 10, 1990.

On January 5, 1991, George returned to his grandmother's apartment building and knocked on the door to Marks' apartment. George told Marks through the door that he wanted to return some items taken in the burglary and said he wanted to apologize because Marks had treated his grandmother so well. George asked to come inside to talk to Marks but Marks declined and called the police. George left a box containing several items. Police checked the items for George's fingerprints, but did not find any. However, a videotape from a camcorder belonging to Marks that was recovered from the Westland residence contained recorded images of George.

San Diego police turned Marks' handgun over to ATF Agent Robert Lowery, who tested the gun and determined it was functional. Lowrey lifted a number of fingerprints from the handgun, two of which turned out to belong to George. Agent Lowery also determined that the weapon had traveled in interstate commerce, having been manufactured in Massachusetts and bearing

the seal of the Missouri Highway Patrol. The parties entered into a stipulation that as of December 20, 1990, George had previously been convicted of a felony.

### B. *George's Testimony*

George testified at his trial that he did not commit or participate in the burglary of Marks' apartment. According to George, he visited with his grandmother following his initial run-in with Marks on December 10, 1990 and then went to the Westland residence to make arrangements to live there because he was being kicked out of his parents' home. He said his friend, Steve Smith, lived in the house and wanted him to prepare to move Smith's things into storage. According to George, Rundles had a key to the Westland house and was residing there, also with the permission of Smith.

George said he returned to his grandmother's apartment building again on the night of December 10, 1990 to deliver some gin and cigarettes to her. He said Rundles had given George and his girlfriend a ride and was to wait outside the building for them. George said his grandmother was too drunk to open the door to her apartment, so he went to Marks' office to get a passkey, but no one answered the door. George said his grandmother finally managed to get the door open, and he and his girlfriend stayed with her for about an hour and a half. George said that as he was walking out of the complex, he noticed some electronic items strewn along the walkway. According to George, Rundles was not waiting outside when he and his girlfriend exited the building, so they spent the night at George's sister's house.

George testified that he returned to the Westland residence the next day, December 11, to see if Rundles was there because George did not have a key. Rundles was not at the house, but his truck was, and George said he noticed "a lot of equipment" in the cab. The next day, December 12, George found Rundles at the house and was let in. According to George, Rundles agreed to leave a side door to the house open so George and his girlfriend could come and go as they wished. George lived in the home from December 12 until his arrest.

George claimed he inadvertently touched the handgun while rummaging through a drawer in search of some tapes to listen to with his girlfriend. He said he did not know it was a gun until he touched it. He also said he did not pick it up. George said that because his girlfriend was planning to have her niece and little brother over that night, he asked Rundles to put the gun out of their reach. Rundles agreed, and that was the last time, according to George, that he ever saw the gun.

Asked to explain how his image got on Marks' videotape, George said he saw the camcorder in Rundles' room and, with Rundles' permission, he and his girlfriend played around with the device.

As for his visit to Marks' apartment on January 5, 1991, George testified that he came across some items under a sink and realized they belonged to Marks. George claimed he confronted Rundles and demanded that he put the items in a box so George could return them to Marks and avoid getting his grandmother in trouble. George testified that he never apologized to Marks for committing the burglary but only for "the mere fact that [Marks] had been victimized in a burglary."

## DISCUSSION

### A. *Hearsay*

A district court's decision denying a motion for mistrial is reviewed by an appellate court for abuse of discretion. *United States v. Homick*, 964 F.2d 899, 906 (9th Cir.1992); *United States v. Segal*, 852 F.2d 1152, 1155 (9th Cir.1988). The same standard applies to a district court's decision to admit evidence over a hearsay objection. *United States v. Dean*, 980 F.2d 1286, 1288 (9th Cir.1992).

George contends that the trial court allowed in inadmissible hearsay in the form of a question put to George by the Government regarding an eyewitness account of the burglary. The question and response at issue were as follows:

Q Did you read that in a report, Mr. George, about the witness seeing two black

males loading a pick-up with merchandise and belongings?

A   I recall something in there about someone having seen two black men on the premises, or something, but the witness was never brought forth, so we were never able to verify that.

Following objections by George's counsel, the court agreed to strike the question and answer and give the jury a limiting instruction.   After going back and forth with George's counsel and the Government over what the content of the limiting instruction should be, the court invited George's counsel to "write it down."   He did not however, and the court gave the following instruction to the jury:

> Ladies and gentlemen of the jury, during the course of this trial, in one of the questions, you heard some reference to a supposed statement that two black men had allegedly witnessed something to do with a pick-up truck (sic).   You're to disregard that.   That's hearsay information and it's not relevant to this case and it's not to be considered by you.   A question, also—just because somebody asked the question, that doesn't mean that that is evidence at all, and you're also to disregard any answer concerning that.

George's counsel complained outside the presence of the jury that the instruction misstated the testimony, i.e., the testimony concerned two black males loading a pickup truck, not two black males witnessing something to do with a pickup.   George's counsel moved for a mistrial, arguing that a further limiting instruction would only reinforce the jurors' memory of the original testimony, thus prejudicing his client.   The court again denied the motion, noting that the jury had already been repeatedly instructed that George was not on trial for burglary and that his participation or nonparticipation in the burglary was not at issue.

Assuming without deciding that the testimony in question was inadmissible hearsay, reversal would be warranted only if any error in the initial admission of the evidence was not harmless.   *United States v. Bradley,* 5 F.3d 1317, 1322 (9th Cir.1993).   *See also* Fed.R.Crim.P. 52(a).

George was not on trial for burglary, but for being a felon in possession of a firearm.   The hearsay evidence was not crucial to proof of any element of the crime charged. *See Weaver v. United States,* 37 F.3d 1411, 1413 (9th Cir.1994).   Moreover, the Government presented overwhelming evidence of George's guilt, including his fingerprints on the gun and the fact that he lived at the residence where the weapon was found.   Any error by the district court in admitting the testimony was thus harmless beyond a reasonable doubt.

## B.   *Juror Misconduct*

This court reviews a district court's denial of a motion for a new trial for an abuse of discretion.   *United States v. La-Fleur,* 971 F.2d 200, 206 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993).   Although an appeals court reviews allegations of juror misconduct independently, it should accord "substantial weight" to the district court's conclusions as to the effect of the alleged misconduct.   *Id.*

George argues that the jurors' use of a magnifying glass[1] to examine the fingerprint cards and gun entered into evidence by the Government led to the creation of "new" evidence, i.e., certain jurors' conclusion that the prints came from both sides of the gun and that George thus must have touched the weapon more than once.   In support of his motion, George offered the declaration of the jury foreperson.

The district court properly refused to consider those portions of the declaration describing the alleged effect that the jurors' use of the magnifying glass had on their deliberations.   Jurors may not testify as to how they or other jurors were affected by extraneous prejudicial information or outside influences;   they may only testify as to its existence.   *Hard v. Burlington Northern R.R. Co.,* 870 F.2d 1454, 1461 (9th Cir.1989);

---

1.   It was revealed at argument that the magnifying glass in question was a small fold-out magnifier that one of the jurors happened to be wearing on a chain around her neck.

*Abatino v. United States,* 750 F.2d 1442, 1446 (9th Cir.1985).

The court also correctly concluded that the jurors' use of a magnifying glass, in and of itself, did not constitute extrinsic evidence. *See United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986), *cert. denied,* 479 U.S. 831, 107 S.Ct. 118, 93 L.Ed.2d 64 (1986) (holding use of a magnifying glass indistinguishable from a juror's use of corrective eyeglasses to examine evidence); *United States v. Miranda,* 986 F.2d 1283, 1286 (9th Cir.1993), *cert. denied,* — U.S. ——, 113 S.Ct. 2393, 124 L.Ed.2d 295 (1993) (noting that defendant alleging juror misconduct involving magnifying glass conceded, "as he must," that a magnifying glass is not extrinsic evidence).

No "new evidence" resulted from the jurors' use of a magnifying glass to examine the fingerprint cards and gun. The district court thus properly denied his motion for a new trial.

### C. *Motion to Proceed Pro Se*

The factual findings of a district court in support of its denial of a defendant's motion to proceed pro se are reviewed by this court only for clear error. *United States v. Kienenberger,* 13 F.3d 1354, 1356 (9th Cir. 1994). It is unclear in this circuit if the district court's ultimate determination as to whether those facts support a denial of the motion is reviewable de novo or for an abuse of discretion. *See United States v. Smith,* 780 F.2d 810, 811 (9th Cir.1986). In the instant case, however, reversal is merited under neither standard.

A defendant has a constitutional right to proceed pro se. *Faretta v. California,* 422 U.S. 806, 817–18, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975). However, a request to represent oneself "need not be granted if it is intended merely as a tactic for delay." *United States v. Flewitt,* 874 F.2d 669, 674 (9th Cir.1989). A court may consider events preceding a motion for self-representation to determine whether the request is made in good faith or merely for delay. *Id.* at 675.

The district court's findings provide ample basis for its conclusion that George's motion was made for purposes of delay: (1) George's pre-trial conduct, i.e., his two escapes, had caused substantial delay; (2) George sought a continuance in conjunction with his motion to proceed pro se; (3) the court had previously denied motions for additional continuances; and (4) George could and should have brought the motion earlier than the eve of trial. These findings were not clearly erroneous. In light of them, the district court did not err in denying George's motion to represent himself.

### D. *Sentencing*

An appellate court reviews de novo the legality of a sentence and the district court's interpretation and application of the Sentencing Guidelines. It examines for clear error the district court's findings of fact supporting a particular sentence. *United States v. Mullins,* 992 F.2d 1472, 1478–79 (9th Cir.1993), *cert. denied,* — U.S. ——, 113 S.Ct. 2997, 125 L.Ed.2d 691 (1993). This court reviews a district court's departure from the sentencing guidelines by a three-step process: First, this court determines whether the district court had the legal authority to depart. Next, this court reviews for clear error the district court's findings of fact supporting the existence of the identified circumstances warranting departure. Finally, the appellate court must determine whether the extent of the district court's departure was unreasonable within the meaning of 18 U.S.C. § 3742(e)(3) and (f)(2). *United States v. Lira–Barraza,* 941 F.2d 745, 746–47 (9th Cir.1991) (en banc).

The district court explained its sentencing decision in a 52–page Order and Memorandum Decision. After determining that George was subject to sentencing under the Armed Career Criminal Act on the basis of his prior convictions for four violent felonies, the court outlined three alternative routes by which it arrived at its sentence of life in prison: First, the court determined George's base offense level to be 33, pursuant to the ACCA provisions of the Sentencing Guidelines, and his criminal history category to be VI. The court then departed upward, using

a horizontal analogy, to a criminal history category of VIII. This provided a sentencing range, as an analogy, of 360 months to life. As a second alternative, the court set George's base offense level at 35, applying a two-level adjustment for perjury, and then departed upwards, by using a vertical analogy, two points for George's escape. This also provides for a sentencing range of 360 months to life. As a third alternative, the district court left George's base offense level at 33, but departed upwards four points based on George's perjury and escape. This also resulted in a sentencing range of 360 months to life.

### 1. The Armed Career Criminal Act

■ As an initial matter, this court finds no merit in George's argument that the ACCA, as codified at 18 U.S.C. § 924(e)(1), is unconstitutionally vague as applied to him. The four predicate convictions relied on by the district court in sentencing George stemmed from offenses that occurred at different times and on different dates, in three separate locations, and involving three separate victims. He was thus subject to sentencing under the ACCA.

### 2. Criminal History Category Departure

■ The district court's departure from the Sentencing Guidelines is another matter, however.[2] An upward departure in a defendant's criminal history category under section 4A1.3 is warranted only "when the criminal history category *significantly under-represents* the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3 (1992) (emphasis added). This court has held that an upward departure under section 4A1.3 is warranted only in an unusual case, "because the criminal history category of the sentencing guidelines is designed to expressly account for a defendant's prior criminal conduct." *United States v. Carrillo–Alvarez*, 3 F.3d 316, 320 (9th Cir.1993). Thus, a district court should not depart unless the defendant's criminal

record is "'significantly more serious' than that of other defendants in the same criminal history category." *Id.* (citation omitted). Moreover, the district court must state the *particular facts* that show that the defendant is unlike others in the same criminal history category. *Id.* at 324.

■ A district court's finding that a defendant has a long record of criminal conduct of escalating seriousness and that prior incarcerations have not affected his propensity to commit crimes may support an upward departure from Category VI under section 4A1.3. *See United States v. Singleton*, 917 F.2d 411, 413 (9th Cir.1990). A finding that a defendant's criminal record indicates a strong propensity to commit further crimes will also support departure. *See United States v. Durham*, 941 F.2d 858, 863 (9th Cir.1991). However, the mere fact that a defendant has significantly more criminal history points than the 13 required to qualify for Criminal History Category VI (in the instant case George has 35) will not, in and of itself, support a departure. *Carrillo–Alvarez*, 3 F.3d at 322.

■ In justifying its upward departure, the district court noted George's nineteen criminal convictions since 1977 (a string uninterrupted even during periods of incarceration, during which he committed drug and escape offenses). The court also noted that the periods during which George was free from custody were short-lived, invariably ending in convictions on new felony offenses. The court also cited the absence of any evidence that George had made any progress toward rehabilitation, his lack of respect for the law, and an extremely high likelihood of recidivism. Additionally, the court noted that George received no criminal history points for three prior felony convictions.

Despite the thoroughness with which the district court laid out its basis for departure, it is not clear, on balance, that George's criminal record is "significantly more serious" than that of other offenders in Category

---

**2.** With an offense level of 33 under the Sentencing Guidelines' ACCA provisions and a criminal history category of VI, George would have ordinarily been subject to a sentencing range of 235–

293 months. Under the various sentencing alternatives employed by the district court, however, George was subject to a sentencing range of 360 months to life.

VI. Unlike the defendant in *Singleton, supra,* George's record of convictions has not escalated in seriousness over the years. He committed his most serious offenses (robbery, rape and burglary) between 1975 and 1977. His convictions since 1977 have involved drug possession in jail, auto and other thefts, and escape. None of the offenses since 1977 have involved violence of the kind employed by George in the 1975–77 offenses. If the record of the defendant in *Singleton* of offenses accelerating in seriousness from criminal mischief to serious felonies involving assaultive behavior "just barely" justified departure, *Singleton,* 917 F.2d at 413, it is not at all clear that George's record up to the time of the instant offense would justify such a departure.

Accordingly, this court finds that the district court did not have authority to depart upward in determining George's criminal history category.

### 3. *Upward Adjustment Under Chapter Three*

■ As an alternative basis for its sentence, the district court found it could adjust George's base offense level of 33 by two levels for perjury and then depart upward by two points for escape.

Section 4B1.4 of the Sentencing Guidelines prescribes an offense level under the ACCA that is the greater of the defendant's ordinary offense level, including all adjustments applicable under Chapters Two and Three of the Guidelines, or, in George's circumstances, a default offense level of 33. Section 4B1.4 expressly provides for only one adjustment to the default offense level under the ACCA, a downward adjustment under section 3E1.1 for acceptance of responsibility. George argues that no other adjustments are thus permitted.

In fact, section 4B1.4 of the Guidelines seems to strongly imply that the district court should follow a set sequence in arriving at an offense level under the ACCA:

(b) The offense level for an armed career criminal is the greatest of:

    (1) The offense level applicable from Chapters Two and Three; or

    (2) the offense level from § 4B1.1 (Career Offender) if applicable; or

    (3)(A) 34, if the defendant used or possessed the firearm or ammunition in connection with a crime of violence or controlled substance offense....

    (B) 33, otherwise.[*]

---

[*] If an adjustment from § 3E1.1 (Acceptance of Responsibility) applies, decrease the offense level by the number of levels corresponding to that adjustment.

U.S.S.G. § 4B1.4 (1992).

Any upward adjustments under Chapter Three, including an adjustment for perjury or other obstruction under section 3C1.1, would have been factored into section 4B1.4(b)(1), "[t]he offense level applicable from Chapters Two and Three[.]" In this case the district court was to choose between the greater of the offense level calculated under Chapters Two and Three (which the court concluded would be 30, *including* a two-point increase for perjury) and 33, the applicable default under section 4B1.4(b)(3)(B). The offense level of 30 already included an adjustment for perjury. It nonetheless was lower than the default of 33, which the court thus applied. By adding another two points onto the offense level of 33, the court, in essence, double counted for perjury.

As the courts of at least two other circuits have implicitly recognized, it seems doubtful that the Sentencing Commission intended such a result. *See United States v. Amos,* 984 F.2d 1067, 1072–73 n. 6 (10th Cir.1993); *United States v. Hamilton,* 992 F.2d 1126, 1131 (10th Cir.1993); *United States v. Fitzhugh,* 954 F.2d 253, 255 (5th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 259, 126 L.Ed.2d 211 (1993).

### 4. *Upward Departure Under Chapter Five*

■ As yet another alternative basis for its sentence, the district court kept George's offense level at 33, but departed upward for perjury, escape, or both pursuant to section 5K2.0 of the Guidelines.

A district court " 'may not depart from the applicable Guideline range unless it identifies an aggravating circumstance of a kind or to a

degree the Commission did not adequately take into account when formulating the Guidelines.'" *United States v. Madera–Gallegos,* 945 F.2d 264, 268 (9th Cir.1991) (quoting *Lira–Barraza,* 941 F.2d at 746). Where the applicable offense guideline and adjustments under Chapters Two and Three do take into account a particular factor, departure is warranted "only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense." U.S.S.G. § 5K2.0 (1992).

Section 3C1.1 of the Sentencing Guidelines takes both perjury and escape into account under the rubric of "obstructing or impeding the administration of justice." In fact, the district court applied a two-point adjustment for perjury and a two-point adjustment for escape under section 3C1.1 in arriving at a preliminary offense level of 30 before opting for the ACCA offense level of 33.

The district court's findings do not support a conclusion that the seriousness of George's perjury and escape were "substantially in excess" of that ordinarily involved in such conduct.[3] Accordingly, upward departure was not warranted.

## CONCLUSION

We affirm the judgment of conviction but reverse as to the sentence and remand for resentencing.

---

**3.** George actually escaped twice from custody during the pendency of the instant matter. The first escape occurred on June 1, 1992 and was the subject of Count II of the indictment. He was convicted on that count. He escaped a second time on October 5, 1992, allegedly assaulting a sheriff's deputy and using her gun to kill a passing motorist, whose car George then allegedly stole to make his get-away. At the time of sentencing, the district court took only the first escape into account. As this court recently held, however, a district court may take postconviction offenses that occur pending sentencing into account in deciding whether to depart upward from the guidelines. *United States v. Myers,* 41 F.3d 531, 534 (9th Cir.1994). Thus, on remand, the district court may properly consider the second alleged escape and murder in arriving at a new sentence.