<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-2181

                         UNITED STATES,

                           Appellee,

                               v.

                       KENNETH M. CONLEY,

                     Defendant, Appellant.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Robert E. Keeton, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

                Selya and Lynch, Circuit Judges.

                     _____________________

   Willie J. Davis, with whom Frances L. Robinson, and Davis,
Robinson & White, LLP were on brief, for appellant.
   S. Theodore Merritt, Assistant United States Attorney, with
whom Bill Lann Lee, Acting Assistant Attorney General, Donald K.
Stern, United States Attorney, and Sheryl L. Robinson, Trial
Attorney, Criminal Section, were on brief, for appellee.

                      ____________________

                         July 23, 1999
                      ____________________

 TORRUELLA, Chief Judge.  The underlying case in this
appeal stems from an April 1997 federal grand jury investigation
into an incident in which Michael Cox, a plain clothes Boston
police officer, was allegedly mistaken for a fleeing suspect and
beaten by unknown police officers in violation of 18 U.S.C.  242.  
On May 29, 1997, defendant-appellant Kenneth Conley, a Boston
police officer at the scene of the incident, testified before the
grand jury pursuant to an immunity order.  Conley was subsequently
convicted of perjury and obstruction of justice as a result of his
grand jury testimony and was sentenced to thirty-four months
imprisonment and a $6,000 fine.  Conley now appeals his conviction.
                           BACKGROUND
 At approximately 2:30 a.m. on January 25, 1995, a
shooting occurred at a restaurant on Blue Hill Avenue in the Grove
Hall section of Boston.  It was mistakenly broadcast over the
police radio that the victim of the shooting was a Boston police
officer.  The suspects were described as four black males driving
a gold Lexus.  The mistaken broadcast of a police officer down
generated a massive response by police cruisers from several
different districts.  A chase ensued.
 The suspects led the police on a lengthy car chase
spanning three police districts and several towns.  The closest
police vehicle behind the Lexus throughout most of the chase was an
unmarked police cruiser occupied by plain clothes officers Craig
Jones and Michael Cox.  Jones was the driver of the vehicle, and  
Cox occupied the passenger seat.
 The car chase finally ended when the suspects drove down
a dead end street known as Woodruff Way in Mattapan.  When the
suspects arrived at the cul-de-sac at the end of Woodruff Way, the
Jones/Cox unmarked cruiser was the first police car on the scene,
and skidded to a stop on the left side of the Lexus.  The second
police cruiser to arrive was occupied by uniformed officers David
Williams and James Burgio.  Williams and Burgio pulled in on the
right side of the Lexus.  Uniformed officer Ian Daley arrived next,
and pulled in directly behind the Lexus.  Immediately behind Daley
was uniformed officer Richard Walker, followed by defendant-
appellant Conley and his partner, Robert Dwan.  The Conley/Dwan
vehicle was thus the fifth police vehicle on the scene.  Conley and
Dwan wore plain clothes and occupied an unmarked police vehicle.
 As the gold Lexus came to a stop at the end of Woodruff
Way, Cox observed one of the suspects, later identified as Robert
Brown, exit the gold Lexus from the passenger side, and run to the
right, towards a fence.  In pursuit, Cox exited his vehicle from
the passenger side, ran behind the Lexus, and followed the suspect
to the right, towards the fence.  Cox described the suspect as a
black male wearing a brown leather jacket.  Cox, also black, was
wearing jeans, a black hooded sweatshirt, and a three-quarter
length black down jacket.
 Cox chased the suspect to the fence, approximately twenty
feet away.  During the chase, Cox was "about three feet" behind the
suspect.  (Tr. Vol. II at 31).  When the suspect got to the fence,
the suspect began climbing over it, catching his jacket for a
moment on the top.  At that moment, Cox reached up and attempted to
grab the suspect and pull him back over the fence.  Cox testified
that approximately two seconds elapsed between the time that the
suspect caught his jacket on the top of the fence and the time when
Cox grabbed the suspect's jacket in an attempt to pull him back
over the fence.  (See Tr. Vol. II at 14, 76).  Cox's attempt
failed, however, and the suspect dropped down on the other side of
the fence and started to run.  Cox did not observe anyone else
climb over the fence between him and the suspect.
 After the suspect landed on the other side, Cox took a
step back from the fence, considering for a moment whether to
follow over the fence.  A moment later, Cox placed both his hands
up on the fence, as if to go over.  At that point, Cox felt a sharp
blow on the back of his head, like a metal pipe.  The next thing he
knew he was on the ground on his hands and knees, trying to get up.  
He observed a white male standing in front of him, wearing boots
and a dark uniform.  Cox was repeatedly kicked in the head, back,
face, and mouth by several different people all at once.  The
beating did not stop until Cox heard someone yell: "Stop, stop,
he's a cop, he's a cop."  (Tr. Vol. I at 88).  When the kicking
finally stopped, Cox attempted to get up from the ground.  When he
looked up, he realized that there was no one around to assist him.  
Cox was forced to use the bumper of a police car to pull himself up
from the ground.
 In April 1997, a federal grand jury commenced an
investigation into the beating of Officer Michael Cox.  The grand
jury sought to determine the identity of the officers who attacked
Michael Cox and/or deliberately failed to prevent the assault and  
to get medical attention for him once they knew he was injured.  On
May 29, 1997, defendant-appellant Conley, an officer present at the
scene, was called before the grand jury to recount the events he
observed and the actions he took at Woodruff Way in the early
morning hours of January 25, 1995.
 Consistent with Cox's version of events, Conley testified  
that when he arrived at the dead end on Woodruff Way, his vehicle
was about the fourth or fifth police car in line behind the
suspects' gold Lexus, approximately forty feet away.  (See Tr. Vol.
II at 229-30, 232).  Also consistent with Cox's account, Conley
testified that once the Lexus skidded to a stop, a black male
wearing a brown leather jacket exited from the passenger side of
the Lexus and ran to the right, towards a fence.  Conley exited his
vehicle in pursuit.  While in pursuit, Conley observed the suspect
scale the fence, drop down on the other side, and start to run.  
(See id. at 233).
 Conley testified that he made all of these observations
as he pursued the suspect, beginning from the time the suspect
first exited the gold Lexus up to the time when the suspect landed
on the other side of the fence and started to run.  According to
Cox's testimony, Conley made these observations at precisely the
same time that Cox was chasing "right behind" the suspect.  (Tr.
Vol. I at 77).  However, before the grand jury, Conley testified
that during that time he did not observe anyone -- either in plain
clothes or in uniform -- between him and the suspect.  In direct
conflict with Cox's account, Conley testified as follows:
          Q:     All right.  Now, officer Conley, when
        you were chasing the suspect as he went
        over to the fence, did you see another
        individual chasing him as well?
          A:     No, I did not.
          Q:     Did you see anyone else in plain
        clothes behind him as he went towards
        the fence?
          A:     No, I didn't.
          Q:     Did you see, as he went on top of the
        fence or climbed the fence, another
        individual in plain clothes standing
        there, trying to grab him?  
          A:     No, I did not.
          Q:     When you saw the suspect get to the top
        of the fence, did you see another
        individual in plain clothes grabbing
        part of his clothing --
          A:     No, I did not.
          Q:     -- as he went over the fence?
          A:     No, I did not.
          Q:     So that didn't happen; is that correct?  
        Because you saw the individual go over
        the fence?
          A:     Yes, I seen [sic] the individual go
        over the fence.
          Q:     And if these other things that I've
        been describing, a second -- another
        plain clothes officer chasing him, and
        actually grabbing him as he went to the
        top of the fence, you would have seen
        that if it happened; is that your
        testimony?
          A:     I think I would have seen that.  
(Tr. Vol. II at 235-36).  Conley further testified that when he got
to the fence, he climbed over it in "approximately the same
location" that he had observed the suspect go over the fence, and
continued in pursuit.  (Id. at 239).  Eventually, after chasing the
suspect for approximately one mile, Conley apprehended him and
effected an arrest.
 Two other individuals, present at the scene, testified at
Conley's trial: Officer Walker, and the suspect, Robert Brown.  
Officer Walker corroborated Cox's version of events up to the point
when the suspect climbed over the fence and dropped down on the
other side:
          Q:     Did you see - did Officer Cox reach for
        the person on the fence?
          A:     Yes, he did.
          Q:     What did the person who went over the
        fence do once they went over the fence?
          A:     Once he went over the fence, he fell.
                               . . .  
          Q:     What did Officer Cox do once the person
        went over the fence?
          A:     I don't know.

(Tr. Vol. II at 32).  After observing the suspect fall on the other
side of the fence, Walker ran from his car straight ahead to a hole
in the fence.  Walker did not see Cox put his hands on the fence,
as if to go over.  The last thing Walker saw Cox do was reach for
the suspect caught on the fence.  (See id. at 33).
 Once through the hole in the fence, Walker ran to the
right, in pursuit of the fleeing suspect.  As he ran, he came upon
two white, plain clothes police officers standing in the street.  
Walker testified that no one had passed by him from the time that
he ran through the hole in the fence to the time when he
encountered the two white police officers.  He did not know where
the two officers had come from; he had not observed them jump over
the fence.  The taller of the two officers asked Walker whether he
had a light, and when Walker responded that he did not, the taller
officer took off running.  Walker followed, approximately two yards
behind.  (See Tr. Vol. II at 67).
 During the chase, the tall white officer in front of
Walker dropped his radio.  Walker stopped to pick up the radio, and
then continued in pursuit.  When the tall white officer finally
apprehended the suspect, Walker returned his radio to him.  At
trial, Walker testified that the tall white officer was
approximately the same height and size as defendant-appellant
Conley.
 Robert Brown, the suspect wearing the brown leather
jacket who was allegedly pursued by both Cox and Conley, also
testified at trial.  Brown corroborated much of Cox's account.  He
testified that when the Lexus skidded to a stop at the end of
Woodruff Way, he exited the vehicle from the rear passenger side,
and headed to the right, towards the fence.  He further testified
that as he ran towards the fence, he looked back and saw a black
man wearing black clothing running behind him.  When he arrived at
the fence, Brown flipped over it, catching his jacket on the top.  
Brown stated that as he attempted to free his jacket from the top
of the fence, he felt somebody touch his foot.  Once he became free
of the fence, Brown fell backwards down a hill, ran into a tree,
and split his tooth in half.  Dazed and confused, Brown remained on
the ground for a moment and observed a black man wearing a "black
hoody" start to "go for the fence."  (Tr. Vol. II at 97-8).  As the
man grabbed for the fence, Brown observed a police officer hit the
man twice on the back of the head with a billy club or a
flashlight, something "shaped like a pipe."  (Id. at 98).  Brown
described the police officer as a tall, black man with a mustache,
wearing a Boston police uniform and a badge.
 Brown next observed a second officer come over to the
fence to assist the tall black officer in wrestling the black man
to the ground.  Once the man was down on the ground, Brown
testified that approximately three or four other police officers --
uniformed and plain clothes -- came over to the fence and began to
kick the man.  At this point, Brown stood up to run.  As he stood
up, Brown made eye contact with a tall white officer on the other
side of the fence.  Brown testified that he did not observe this
white officer kick the man on the ground.
 Once the tall white officer made eye contact with Brown,
Brown began to run, and the white officer followed.  Eventually,
the white officer caught Brown and arrested him.  At trial, Brown
testified that the arresting officer was the same tall white
officer he had made eye contact with through the fence.
 On August 14, 1997, Conley was charged in a three-count
indictment arising from his grand jury testimony.  Count One
charged that Conley committed perjury, in violation of 18 U.S.C.
1623, by denying that he saw Cox chase, pursue, and grab hold of
a suspect as that suspect ran toward and climbed the fence at
Woodruff Way.  Count Two charged that Conley also committed perjury
by denying that he saw Boston police officers strike and kick Cox.  
Count Three charged that Conley obstructed and endeavored to
obstruct the grand jury investigation by giving false, evasive, and
misleading testimony and withholding information, in violation of
18 U.S.C.  1503.  On June 10, the jury returned verdicts of guilty
on Counts One and Three and not guilty on Count Two.   
                           DISCUSSION
 On appeal, Conley raises several challenges to his
conviction.  We address each of his challenges in turn.
1.  The Testimony of the Grand Juror
 Title 18 U.S.C.  1623 states, in relevant part:
   Whoever under oath . . . in any proceeding
 before or ancillary to any court or grand jury
 of the United States knowingly makes any false
 material declaration . . . shall be fined not
 more than $10,000 or imprisoned not more than
 five years, or both.

18 U.S.C.  1623.  It is uncontested that a conviction under  1623
requires that the statements made be "material" to the proceeding,
here a grand jury investigation.  See id.  It is also uncontested
that "materiality" is an element that the government bears the
burden of proving.  The question presented by defendant-appellant
Conley is whether the district court erred in allowing the
government to prove this element by calling Jeanne LaBelle, a
member of the grand jury that investigated the Cox incident, to
testify as to the scope and purpose of the grand jury's
investigation.  Conley contends that the district court erred in
admitting Ms. LaBelle's testimony, and that such error warrants
reversal of his conviction.  We disagree.
 A.  Fed. R. Evid. 606(b)
 Before this court, Conley argues for the first time that
the admission of Ms. LaBelle's testimony violated Fed. R. Evid.
606(b).  Although Conley objected to the admission of
Ms. LaBelle's testimony on other grounds, Conley never raised the
applicability of Rule 606(b) before the district court.  "Our law
is clear that a party ordinarily may not raise on appeal issues
that were not seasonably advanced (and, hence preserved) below."  
Cooperman v. Individual, Inc., 171 F.3d 43, 50 (1st Cir. 1999)
(quoting Daigle v. Maine Medical Center, Inc., 14 F.3d 684, 687
(1st Cir. 1994)).  We see no reason to depart from this well-
established rule in this case.  We thus decline to address Conley's
Rule 606(b) argument, except to say that plain error is plainly
absent.
 B.  Fed. R. Evid. 403
 Conley next claims that the district court erred in
admitting Ms. LaBelle's testimony because its probative value was
substantially outweighed by the danger of unfair prejudice.  See
Fed. R. Evid. 403.  Specifically, Conley argues that the admission
of the testimony of a grand juror who voted to return an indictment
against him was unfairly prejudicial in that it called upon the
petit jury to evaluate the credibility of a grand juror.  Conley
contends that because of the "natural tendency" of the petit jury
to identify with the grand juror, the petit jury inevitably gave
undue weight and credence to Ms. LaBelle's testimony.  Conley
further argues that the admission of Ms. LaBelle's testimony
unfairly prejudiced his case because it caused the jury to confuse
the standards of proof governing the grand jury decision to indict
and the petit jury decision to convict, respectively.  Finally,
Conley claims that the government's use of the testimony of a
member of the grand jury that returned an indictment against him,
violated his presumption of innocence in that it called upon the
jury to infer guilt from the fact of his indictment.  For all of
these reasons, Conley maintains that the admission of Ms. LaBelle's
testimony should have been excluded under Fed. R. Evid. 403.
 We review the district court's Rule 403 determination for
abuse of discretion.  See United States v. Cruz-Kuilan, 75 F.3d 59,
61 (1st Cir. 1996).  We note that "[o]nly rarely -- and in
extraordinarily compelling circumstances -- will we, from the vista
of a cold appellate record, reverse a district court's on-the-spot
judgment concerning the relative weighing of probative value and
unfair effect."  United States v. Saccoccia, 58 F.3d 754, 773 (1st
Cir. 1995) (quoting Freeman v. Package Mach. Corp., 865 F.2d 1331,
1340 (1st Cir. 1988)).
 Although the district court did not make express  
findings with respect to its Rule 403 balancing, it is apparent
from the record that the court was aware of its responsibility to
balance the probative value of Ms. LaBelle's testimony against its
unfairly prejudicial effect.  See United States v. Santagata, 924
F.2d 391, 394 (1st Cir. 1991) (where pleadings and record evidence
show that court was aware of its Rule 403 responsibility, express
findings not necessary).  As the district court noted, the
testimony of Ms. LaBelle was clearly relevant to materiality.  
Ms. LaBelle testified as to the scope and purpose of the grand jury
inquiry:
   We were investigating an assault that took
 place on Officer Michael Cox on January 25th
 of 1995, and we were trying to establish the
 identity of officers who participated in the
 attack.  We were trying to determine if there
 was excessive force used, and also we were
 trying to determine who the officers were who
 deliberately failed to get medical attention
 once they knew that he had been injured.

(Tr. Vol. III at 114).  Ms. LaBelle further testified that
defendant-appellant Conley was one of approximately forty-five
officers called to testify before the grand jury, and that after
Conley's testimony the grand jury did not have any more evidence
concerning the identity of the officers who beat Cox or the
identity of any witnesses to the beating.  Finally, Ms. LaBelle
testified that at the time she ended her service as a grand juror,
the grand jury had not returned any indictments for the assault of
Michael Cox.  Ms. LaBelle's testimony was probative in the sense
that it provided a context for Conley's allegedly false statements
from which the jury could infer materiality.
 We next consider Conley's assertions of prejudicial
effect.  Conley offers no evidence to support his theory that the
petit jurors were improperly influenced by their sense of identity
or "camaraderie" with Ms. LaBelle.  Absent such evidence, we cannot
conclude that the mere possibility that some sort of bonding
occurred between the petit jury and Ms. LaBelle substantially
outweighs the probative value of Ms. LaBelle's testimony.  
Moreover, as the government points out, the petit jury's split
verdict undermines Conley's theory of improper influence.  See
United States v. Dworken, 855 F.2d 12, 29 (1st Cir. 1988) (jury's
acquittal on one count indicates that it was not influenced by
potentially prejudicial evidence).
 Conley's other claims of unfair prejudice stem from the
district court's failure to explicitly instruct the jury with
respect to the different standards of proof governing the grand
jury's decision to indict and a petit jury's decision to convict.  
We find no unfair prejudice.  Any risk of juror confusion
concerning the appropriate standard of proof was minimized by the
district judge's thorough instructions concerning the presumption
of innocence and the government's burden to prove its case beyond
a reasonable doubt.  In addition, the district judge made it
abundantly clear to the jurors on several different occasions that
the indictment returned by the grand jury "is in no sense a part of
the evidence that you will consider as you consider whether the
government has met its heavy burden of proof of guilt beyond a
reasonable doubt."  (Tr. Vol. I at 32).  Finally, the district
judge explicitly requested Conley to submit any additions to the
proposed jury instructions "in order to make it clear that in no
way does receiving any testimony make the indictment a part of the
evidence that the jury is to consider."  (Tr. Vol. III at 71).  
Conley failed to submit any such suggestions and cannot now
complain of unfair prejudice.
 For the reasons discussed above, we conclude that the
district court acted well within its discretion in allowing the
government to call Ms. LaBelle to testify as to the scope of the
grand jury investigation for the purpose of proving the materiality
of Conley's statements.
 C.  Fed. R. Crim P. 6(e)(2)
 Conley next alleges that the district court erred by
permitting Ms. LaBelle to testify because the government failed to
petition the court in advance for a disclosure order as required by
Fed. R. Crim. P. 6(e)(3)(C)(i) & (D).  We review Conley's claim de
novo to the extent that he raises a legal issue with respect to the
applicability of Fed. R. Crim. P. 6(e)(3)(C)(i) to the
circumstances of this case.  See Civil v. INS, 140 F.3d. 52, 58
(1st Cir. 1998).
 Fed. R. Crim. P. 6(e) codifies the traditional rule of
grand jury secrecy.  See Fed. R. Crim. P. 6(e).  Under subsection  
6(e)(2) grand jurors, attorneys for the government, and other
personnel attached to the grand jury, are prohibited from
disclosing matters occurring before the grand jury.  See Fed. R.
Crim. P. 6(e)(2).  Of course, there are exceptions to this general
rule, see Fed. R. Crim. P. 6(e)(3), and the government and Conley
disagree with respect to which exception (if any) applies here.
 Conley contends that pursuant to subsection
6(e)(3)(C)(i), see supra n.9, the government was required to
petition the district court for a disclosure order before calling
Ms. LaBelle to testify at trial as to the scope of the grand jury
inquiry.  Conley argues that the government's failure to comply
with the specific procedures set forth in subsection 6(e)(3)(D),
see supra n.9, constitutes reversible error.  The government
asserts that it was under no obligation to petition the court for
an order of disclosure because it was entitled under 6(e)(3)(A)(i)
to disclosure as a matter of course.  We agree with the
government.
 Subsection 6(e)(3)(A)(i) authorizes disclosure as a
matter of course, without any court order, to "an attorney for the
government for use in the performance of such attorney's duty."  
Clearly, government attorneys have a duty to prosecute perjury
before a grand jury.  In the performance of this duty, "it has been  
standard practice for government attorneys to use the transcript of
the grand jury proceedings in preparing a case for trial,
refreshing the recollection of government witnesses, impeaching
witnesses at trial, and prosecuting for perjury before the grand
jury."  Wright & Miller, 1 Fed. Prac. & Proc. Crim. 3d  107
(1999).  No court order is or has been required for this type of
disclosure.  See id.; see also United States v. Garca, 420 F.2d
309, 311 (2d Cir. 1970) ("No purpose would be served by requiring
the court to approve a use of grand jury minutes which is implicit
in the duties of the United States Attorney.").  Although we have
found no case law upholding the specific right of government
attorneys to similarly call grand jurors to testify as witnesses at
trial without prior court approval, we conclude that this means of
fulfilling the government attorney's duty also falls within the
scope of (A)(i).
 In this case, Ms. LaBelle disclosed to the government
attorney information concerning the scope and purpose of the grand
jury inquiry.  The purpose of this disclosure was to assist the
government attorney in the performance of his duty to prove the
materiality of Conley's statements, in order to prosecute perjury
before the grand jury.  Such use falls squarely within the scope of
Rule 6(e)(3)(A)(i) and thus the government was under no obligation
to obtain prior court approval.
2.  The Sufficiency of the Evidence
 The district court's denial of Conley's motion for
judgment of acquittal presents a question of law, which we review
de novo.  See United States v. Czubinski, 106 F.3d 1069, 1073 (1st
Cir. 1997).  Like the district court, "we scrutinize the evidence
in the light most compatible with the verdict, resolve all
credibility disputes in the verdict's favor, and then reach a
judgment about whether a rational jury could find guilt beyond a
reasonable doubt."  United States v. Taylor, 54 F.3d 967, 974 (1st
Cir. 1995).
 Count One of the indictment charges Conley with knowingly
making false material statements before the grand jury with respect
to whether he observed an individual later determined to be Officer
Michael Cox, "chase, pursue, and grab hold of a suspect as that
suspect ran toward and climbed a fence in his attempt to get away
from police at or near Woodruff Way . . . on January 25, 1995."  
Count Three of the indictment charges Conley with corruptly
endeavoring to obstruct the pending grand jury inquiry by making
those false statements.  The exchange upon which these accusations
are based went as follows:
          Q:     All right.  Now, officer Conley, when
        you were chasing the suspect as he went
        over to the fence, did you see another
        individual chasing him as well?
          A:     No, I did not.
          Q:     Did you see anyone else in plain
        clothes behind him as he went towards
        the fence?
          A:     No, I didn't.
          Q:     Did you see, as he went on top of the
        fence or climbed the fence, another
        individual in plain clothes standing
        there, trying to grab him?  
          A:     No, I did not.
          Q:     When you saw the suspect get to the top
        of the fence, did you see another
        individual in plain clothes grabbing
        part of his clothing --
          A:     No, I did not.
          Q:     -- as he went over the fence?
          A:     No, I did not.
          Q:     So that didn't happen; is that correct?  
        Because you saw the individual go over
        the fence?
          A:     Yes, I seen [sic] the individual go
        over the fence.
          Q:     And if these other things that I've
        been describing, a second -- another
        plain clothes officer chasing him, and
        actually grabbing him as he went to the
        top of the fence, you would have seen
        that if it happened; is that your
        testimony?
          A:     I think I would have seen that.  
    
(Tr. Vol. II at 235-36).  Conley argues that the government
presented insufficient evidence at trial to prove that these
statements were false.  We disagree.
 The weakness of the government's case lies in the absence
of any direct evidence as to what Conley in fact observed during
the early morning hours of January 25, 1995 in the cul-de-sac at
the end of Woodruff Way.  But this weakness is not fatal.  As this
court has recognized:
   Perjury cases, like all criminal cases, are
 susceptible to proof by circumstantial
 evidence, and in fact are peculiarly likely to
 be proven in this manner because one of the
 elements of the crime is that the defendant
 knew his statement was false when he made it.

United States v. Moreno Morales, 836 F.2d 684, 690 (1st Cir. 1988)
(quoting United States v. Chapin, 515 F.2d 1274, 1278 (D.C. Cir.
1975)).  At trial, the government presented ample circumstantial
evidence from which a rational jury could conclude that Conley's
statements were false beyond a reasonable doubt.
 By comparing Conley's testimony about the timing and
location of his actions with the testimony of Cox, Walker, and
Brown, the jury reasonably concluded that Conley lied when he
stated that he did not observe Cox chasing the suspect.  Conley
testified that upon arrival at the scene, he observed Brown exit
from the passenger side of the Lexus, run to the right, and climb
over the fence.  Most significantly, Conley testified that "within
seconds of seeing [the suspect] go over" the fence he scaled the
fence at the same location.  (Tr. Vol. III at 15; Vol. II at 239).
 Both Cox and Walker placed Cox at the exact same time at
the exact same place where Conley claims to have climbed over the
fence.  According to their testimony, which we must view in the
light most favorable to the verdict, see United States v. Olbres,
61 F.3d 967, 970 (1st Cir. 1995), Cox was "right behind" Brown,
approximately three feet behind him, as Brown approached the fence.  
(Tr. Vol. I at 77; Vol. II at 31).  When Brown reached the fence,
Cox was even closer.  At that point, Cox was close enough to make
contact with Brown and attempt to pull him back over the fence.  
Brown corroborated this version of events when he testified that a
black man wearing a "black hoody" was behind him as he ran toward
the fence and had just started to come over the fence after him
when he observed the black man being struck on the head by a police
officer.  (Tr. Vol. II at 94, 97, 98).  Brown confirmed that the
person behind him was close enough to make contact with his foot as
he scaled the fence.  (See Tr. Vol. II at 96).
 Conley's testimony that he scaled the fence "within
seconds" of seeing Brown go over the fence, and that he scaled the
fence in the same location as Brown does not square with the
testimony of Cox, Walker, and Brown.  Conley's version of the
events provides for no reasonable gap in time during which he could
have missed observing Cox at the fence.  Indeed, Conley concedes
that if the Cox/Walker/Brown version is true, he would have seen
Cox at the fence.  (See Tr. Vol. II at 236).  In reaching its
verdict, the jury apparently found the Cox/Walker/Brown version
more credible.
 Our role on review is limited.  We must "resolve all
credibility disputes in the verdict's favor."  Olbres, 61 F.3d at
970.  Based on the evidence, we find that the jury was entitled to
credit the testimony of Cox, Walker, and Brown, and conclude that
Conley's statements before the grand jury were false.  We thus
affirm the district court's denial of Conley's motion for judgment
of acquittal with respect to Counts One and Three.

3.  Fed. R. Evid. 106
 Conley next contends that the district court abused its
discretion in admitting into evidence excerpts of the transcript of
his grand jury testimony, then denying his request to admit the
transcript in its entirety for the purpose of placing those
excerpts in a proper context as required by Fed. R. Evid. 106.  
The government maintains, however, that despite explicit
questioning by the district court, Conley failed to articulate how
or why the entire transcript would qualify or explain the excerpts
offered by the government.  Therefore, the government contends
that the district court acted well within its discretion in denying
Conley's request.
 Under prevailing federal practice, objections to
evidentiary rulings must be reasonably specific in order to
preserve a right to appellate review.  See United States v.
Holmquist, 36 F.3d 154, 168 (1st Cir. 1994) (citing United States
v. Walters, 904 F.2d 765, 769 (1st Cir. 1990)).  A litigant's
failure to sufficiently articulate the grounds for an objection
bars the litigant aggrieved by the ruling from raising more
particularized points for the first time on appeal.  See id.  In
an attempt to avoid waiver of his Rule 106 argument under this
general rule of practice, Conley now maintains that the relevancy
of particular portions of his grand jury transcript only became
apparent to him after the government's closing arguments.
 In his appellate brief, Conley points for the first time
to two specific portions of his grand jury transcript that he
claims should have been admitted into evidence under Rule 106.  
The first excerpt contains Conley's testimony that he was
interviewed twice by Internal Affairs ("IA") about the Cox
incident.  Conley argues that this portion should have been
admitted into evidence under Rule 106 in order to place in proper
context the portions submitted by the government in which Conley
testified that he never identified himself to homicide detectives
or the district attorney as the arresting officer on the scene on
the night of the Cox incident.  The government submitted this
evidence to suggest that Conley did not want to be identified as a
witness to the Cox incident.  The problem with Conley's Rule 106
argument is two-fold.  First, it is clear from the opening
statements that Conley was aware that the government intended to
introduce this evidence and to advance this theory of guilt.  
Thus, we find no reason to make an exception to our general rule of
waiver.  Second, even if we did allow Conley to make this argument
for the first time on appeal, we are not convinced that the
district court's exclusion of this part of the transcript was
error.  We fail to see how testimony to the effect that Conley was
interviewed by Internal Affairs, and wrote a report of the incident
pursuant to an order by the IA investigators, adds to the
evidentiary value of the admitted excerpts.  In our view, a more
relevant portion of the transcript from a Rule 106 perspective was
Conley's explanation as to why he did not notify the homicide
investigators or the district attorney's office of the arrest, and
this portion appropriately was introduced into evidence.
 The second portion of his grand jury testimony that
Conley claims should have been admitted is testimony concerning
Conley's relationship with Officers Burgio and Williams.  At trial,
the government presented excerpts of Conley's grand jury testimony
in order to suggest that Conley lied about his involvement in the
Cox incident because he wanted to protect his friends, Officers
Burgio and Williams.  The government's submitted excerpts, however,
included Conley's testimony to the effect that Officer Burgio was
not a friend of Conley's, (See Tr. Vol. II at 246), and that
although Conley became acquainted with Officer Williams at the
police academy, he did not socialize or "go out for drinks" with
him.  (Tr. Vol. III at 10).  The inclusion of additional testimony
bearing on this issue was not necessary to place the government's
excerpts in proper context under Fed. R. Evid. 106.
 In making determinations as to the completeness of
proffered statements, the district court's judgment is entitled to
great respect.  See United States v. Houlihan, 92 F.3d 1271, 1283
(1st Cir. 1996).  We conclude that the district court acted well
within its discretion in denying Conley's request that the entire
transcript of his grand jury testimony be admitted into evidence.
4.  The Jury's Request for a Ruler
 During jury deliberations, the district judge received a
note from the jury requesting a ruler.  Over Conley's objection,
the district judge granted the jury's request, and instructed the
jury that the ruler was only to be used on exhibits which contained
an approximate scale for measurement.  Conley contends that the
district judge's decision to provide the jury with a ruler violated
his right to confrontation under the Sixth Amendment to the United
States Constitution, and requires reversal of his conviction.
 At the outset we note our disagreement with the
government's characterization of a ruler as merely another generic
tool to aid a jury in examining exhibits.  A diagram based on an
approximate scale contains, by definition, imprecise distances and
dimensions.  Therefore, pursuant to the district judge's
instructions, the jury was using the ruler to obtain more precise
information from an exhibit that was imprecise.  The use of a ruler
under these circumstances is inherently different from the jury's
use of a magnifying glass to more clearly observe photographs or
fingerprints admitted into evidence.  See, e.g., United States  v.
George, 56 F.3d 1078, 1084 (9th Cir. 1995) (jury used magnifying
glass to examine fingerprint cards and gun); United States v.
Young, 814 F.2d 392, 396 (7th Cir. 1987) (jury used magnifying
glass to examine photographs).
 The weakness in Conley's argument, however, is that it
fails to address the root of the problem: the original admission of
the exhibit containing the approximate scale.  At trial, Conley
never objected to the admission of Exhibits 7 or 7A, nor does he
make such objection on appeal.  If, as Conley suggests, the
distances and special dimensions of the area at Woodruff Way were
critical to the government's charge that Conley must have seen Cox
as Conley pursued Brown, Conley should have made a contemporaneous
objection to the admission of such an imprecise depiction of the
crime scene.
 A district judge's decision to provide a jury with
requested material to aid in its examination of the evidence is
reviewed for abuse of discretion.  See United States v. Rengifo,
789 F.2d 975, 983 (1st Cir. 1986).  Under the circumstances of this
case, we cannot conclude that the district judge abused his
discretion in granting the jury's request for a ruler.  As the
district judge reasoned, once the diagram was admitted into
evidence, the jury's request for a ruler was both forseeable and
reasonable.  Moreover, even if the request had been denied, there
was nothing to prevent the jury from simply making its own, perhaps
even more inaccurate, ruler.  Therefore, we conclude that the
district judge acted within his discretion when he granted the
jury's request.
5.  Sentencing Issues
 Conley's main claim of sentencing error is that the
district court erred in calculating his base offense level by
cross-referencing to the sentencing guideline applicable to the
underlying offense of aggravated assault.  We review the district
court's factual determinations under the sentencing guidelines for
clear error.  See United States v. Nez, 146 F.3d 36, 40 (1st Cir.
1998).  However, we review the district court's construction of a
sentencing guideline and its application of the guideline to the
facts de novo.  See id.
 The Sentencing Guidelines generally provide a base
offense level of twelve for perjury and obstruction of justice.  
See U.S.S.G  2J1.2(a) & 2J1.3(a).  However, if the defendant
committed perjury "in respect to a criminal offense," or obstructed
"the investigation or prosecution of a criminal offense," the
Guidelines direct the district court to use a cross-reference and
sentence the defendant as an accessory after the fact "in respect
to that criminal offense."  U.S.S.G.  2J1.2(c)(1) & 2J1.3(c)(1).  
Pursuant to these provisions, the district court cross-referenced
to  2X3.1, the guideline applicable to those convicted of being
accessories after the fact.  Section 2X3.1(a) provides a base
offense level "6 levels lower than the offense level for the
underlying offense."  U.S.S.G.  2X3.1(a).  The district court
concluded that the "underlying offense" was the violation of
constitutional rights by the intentional use of excessive force by
police officers, in violation of 18 U.S.C.  241 & 242, and
referred to the applicable sentencing guideline found at  2H1.1.  
On appeal, Conley does not challenge this initial cross-reference
from  2X3.1(a), to the civil rights guideline found at  2H1.1.  
Rather, Conley challenges the district court's subsequent cross-
reference from  2H1.1(a)(1) to the sentencing guideline applicable
to the underlying offense of aggravated assault, found at  2A2.2.
 The crux of Conley's argument is that his acquittal on
Count Two of the indictment, which charged Conley with lying about
seeing Cox being beaten by Boston police officers, means that the  
underlying offense for which he is sentenced as an accessory after
the fact cannot include the intentional use of excessive force.  
Conley argues that because he was only convicted of lying about
seeing Cox chase the suspect to the fence and grab at him as he
scaled the fence, the offense for which he is sentenced as an
accessory after the fact should only include the other
constitutional deprivations alleged in the indictment: namely, the
failure to prevent the assault, and the failure to provide medical
care.  Because these offenses are not referenced by the guidelines
or by statute as separate underlying offenses, but rather are
subcategories of the civil rights offense, Conley contends that
2H1.1(a)(3) -- and not  2H1.1(a)(1) -- should apply.  We
disagree.
 Conley's acquittal on Count Two has no bearing on what
offenses were under investigation when he testified before the
grand jury.  As the background section to the obstruction of
justice guideline indicates, the cross-reference to  2X3.1 (the
accessory after the fact guideline) is intended to provide an
enhanced offense level for the crime of obstruction of justice when
the obstruction is in respect to a particularly serious offense.  
See Commentary to U.S.S.G.  2J1.2(c)(1).  Consistent with this
purpose, the application of the cross-reference does not depend on
the defendant's actual conviction as an accessory after the fact to
the offense under investigation.  See United States v. Martnez,
106 F.3d 620, 621-22 (5th Cir. 1997);  United States v. Dickerson,
114 F.3d 464, 467 (4th Cir. 1997); United States v. Gay, 44 F.3d
93, 95 (2d Cir. 1994).  Indeed, application of this cross-
reference does not even depend on the defendant's specific
knowledge of the underlying offense:
   [A defendant's] lack of knowledge of the
 specific offenses under investigation is
 irrelevant.  Neither  2J1.2(c)(1) nor  2X3.1
 requires such knowledge as a prerequisite to
 application of the offense level for the
 'underlying offense.'  All that is required is
 that the 'offense involved obstructing the
 investigation or prosecution of a criminal
 offense . . . .'   2J1.2(c)(1). [The
 defendant] knew there was a federal grand jury
 investigation into criminal offenses and that
 he knowingly and willfully attempted to
 obstruct it as the jury so found.  This is
 enough to trigger the cross-referencing
 provisions of the guidelines.

United States v. McQueen, 86 F.3d 180, 184 (1st Cir. 1996).  Conley
knew even more than the defendant in McQueen.  Conley knew that the
grand jury was investigating the assault on Michael Cox by Boston
police officers, and the trial jury found that he knowingly and
willfully obstructed that investigation.  The fact that Conley was
acquitted on Count Two is irrelevant for cross-referencing
purposes.
 Conley further argues that the use of aggravated assault
as the "underlying offense" under  2H1.1(a)(1) is barred by the
plain language of the Commentary to this guideline.  The Commentary
to  2H1.1(a)(1) states: "'Offense guideline applicable to any
underlying offense' means the offense guideline applicable to any
conduct established by the offense of conviction that constitutes
an offense under federal, state, or local law."  Conley contends
that his offenses of conviction are perjury and obstruction of
justice, and that the only conduct established by these convictions
is that he lied before the grand jury about observing Cox chase the
suspect as he ran towards the fence.  As discussed supra, the
purpose of the cross-reference in both the perjury and obstruction
of justice guidelines is to measure the gravity of those offenses.  
We conclude that  2H1.1(a)(1) is similarly employed, and that the
sentencing court need not look exclusively to the offense of
conviction.  This conclusion makes logical sense.  As other courts
have observed, if the "underlying offense" was required to be the
offense of conviction, perjurers and obstructors of justice would
benefit from perjury or obstruction that successfully persuaded a
grand jury not to return an indictment.  See United States v.
Dickerson, 114 F.3d 464, 468 (4th Cir. 1997); McQueen, 86 F.3d at
183.  The Commentary on which Conley relies relates to the
substantive offenses involving individual rights.  These notes are
not relevant under the circumstances presented here because  2H1.1
(a)(1) is being used simply as a formula for the perjury and
obstruction of justice offenses.
 Finally, Conley's argument ignores the specific finding
of the district judge that Conley
   observed through his senses of sight and
 hearing enough to believe that Cox was being
 struck by other police officers and that his
 answering in a misleading and incomplete way
 the questions that were asked before the grand
 jury was obstructing the grand jury's
 investigation to determine whether criminal
 conduct of Boston Police Officers on the scene
 had occurred.

(Tr. of Disposition Hr'g at 6). We review such factual findings
only for clear error.  See Nez, 146 F.3d at 40.  Based on the
evidence presented at trial, see supra, this finding does not
constitute clear error.  Moreover, this finding further supports
the district court's cross-reference to the underlying offense of
aggravated assault.
 We next address Conley's objections to the district
court's application of specific offense characteristics under the
aggravated assault guideline.  In opposing these enhancements,
Conley repeats the argument that his acquittal on Count Two bars
the court from enhancing his offense level based on the specific
characteristics identified in the aggravated assault guideline.  
For the same reasons that we uphold the district court's cross-
reference to the underlying offense of aggravated assault, we
uphold the district court's application of the specific offense
characteristics provided for under the same guideline.
 Conley raises the same argument with respect to the
district court's application of a six level enhancement based on
the specific offense characteristic provided for under  2H1.1(b),
namely, that the underlying offense was committed under color of
law.  Again, for the same reasons that we uphold the district
court's initial cross-reference to  2H1.1(a), we uphold its
application of the six level enhancement pursuant to  2H1.1(b).
 Finally, Conley argues that the district court erred in
denying his request for a four level reduction based on his role as
a minimal participant in the underlying offenses.  See U.S.S.G.
3B1.2(a).  In support of his request for such a reduction, Conley
argued that the relevant criminal activity was the aggravated
assault on Officer Cox.  The district court concluded, however,
that the relevant criminal activity for purposes of  3B1.2 was
Conley's perjury and obstruction of justice.  We agree with the
district court.  We reiterate that the district court's
characterization of the underlying offense as a civil rights
violation, and, more specifically, as aggravated assault, was for
the limited purpose of measuring the gravity of Conley's perjury
and obstruction of justice offenses.  For all other purposes,
Conley's offenses of conviction remain perjury and obstruction of
justice.  Clearly, the district court did not err in concluding
that Conley was not a "minimal participant" in these criminal
activities.
                           CONCLUSION
 Based on the foregoing, the defendant's conviction is
affirmed.

</body>

</html>