UNITED STATES of America,
Plaintiff–Appellee,

v.

Theodore John KACZYNSKI,
Defendant–Appellant.

No. 99–16531.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 3, 2000.[1]

Filed Feb. 12, 2001.

1. The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Theodore John Kaczynski, pro per, Florence, Colorado, defendant-appellant.

Robert J. Cleary, R. Steven Lapham and J. Douglas Wilson, Special Attorneys to the Attorney General, San Francisco, California, for the plaintiff-appellee.

Before: REINHARDT, BRUNETTI, and RYMER, Circuit Judges.

Opinion by Judge RYMER; Dissent by Judge REINHARDT.

RYMER, Circuit Judge:

Theodore John Kaczynski, a federal prisoner, appeals the district court's denial of his motion under 28 U.S.C. § 2255 to vacate his conviction. In that motion, Kaczynski alleges that his guilty plea to indictments returned against him as the "Unabomber" in the Eastern District of California and in the District of New Jersey, in exchange for the United States renouncing its intention to seek the death penalty, was involuntary because his counsel insisted on presenting evidence of his mental condition, contrary to his wishes, and the court denied his *Faretta* request to represent himself.[2] Having found that the *Faretta* request was untimely and not

in good faith, that counsel could control the presentation of evidence, and that the plea was voluntary, the district court denied the § 2255 motion without calling for a response or holding a hearing.

This court issued a certificate of appealability. The government submits that Kaczynski is foreclosed from raising the voluntariness of his plea on collateral review because he did not do so on direct appeal, but we conclude on the merits that the district court did not err. Therefore, we affirm.

## I

The facts underlying Kaczynski's arrest (April 3, 1996) and indictment for mailing or placing sixteen bombs that killed three people, and injured nine others, are well known and we do not repeat them here. Rather, we summarize the pre-trial proceedings that bear on the voluntariness of Kaczynski's plea.

The California Indictment (returned June 18, 1996) charged Kaczynski with four counts of transporting an explosive in interstate commerce with intent to kill or injure in violation of 18 U.S.C. § 844(d); three counts of mailing an explosive device with intent to kill or injure, in violation of 18 U.S.C. § 1716; and three counts of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The New Jersey Indictment (returned October 1, 1996) charged one count of transporting an explosive device in interstate commerce with intent to kill or injure, in violation of 18 U.S.C. § 844(d); one count of mailing an explosive device with intent to kill or injure, in violation of 18 U.S.C. § 1716; and one count of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).[3] The government gave notice of its intent to

---

2. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (recognizing a criminal defendant's Sixth Amendment right to represent himself).

3. The New Jersey Indictment was transferred to the Eastern District of California under Fed.R.Crim.P. 20(a) pursuant to Kaczynski's plea agreement.

seek the death penalty under both indictments on May 15, 1997.

The California Indictment was assigned to the calendar of the Hon. Garland E. Burrell, Jr. Quin Denvir, the Federal Public Defender for the Eastern District of California, and Judy Clarke, the Federal Public Defender for Eastern Washington and Idaho, were appointed to represent Kaczynski. They filed motions to suppress evidence in March, 1997, which were denied.

On June 24, 1997, Kaczynski filed a notice under Fed.R.Crim.P. 12.2(b) of his intent to introduce expert testimony of his mental condition at trial.[4] According to his § 2255 motion, Kaczynski consented to the notice reluctantly and only to allow evidence relating to his "mental condition"—not to a "mental disease or defect." He also avers that the purpose of the notice was to allow psychologist Julie Kriegler, who did not think that he suffered from serious mental illness, to testify.

Jury selection began November 12. Six hundred veniremen were summoned, and 450 questionnaires were filled out. Voir dire of 182 prospective jurors took sixteen days over the course of six weeks.

Kaczynski alleges that he learned in the courtroom on November 25 that his attorneys intended to portray him as suffering from major mental illness (schizophrenia), but that he was deterred from bringing his conflict with counsel to the court's attention as counsel were in plea negotiations with the government.[5] Evidently by December 17 it had become clear that Kaczynski would not go for an unconditional plea and the government would not accept a conditional one. In the meantime, Kaczynski was giving thought to whether he wanted Tony Serra, a San Francisco lawyer whom he believed would not employ a mental state defense, to represent him. On December 16, he received a letter indicating that Serra would be available, but on December 17 Serra withdrew from consideration.

On December 18, Kaczynski's counsel gave the district court three letters in which Kaczynski explained that he had a conflict with his attorneys over the presentation of a mental status defense. The next day the court held an *ex parte, in camera* conference with Kaczynski and counsel, as a result of which he and they undertook to confer over the weekend. On December 22, Clarke and Denvir advised the court that a compromise had been worked out: They agreed to withdraw the Rule 12.2(b) notice and not to present any expert mental health testimony at the guilt phase of the trial, while Kaczynski accepted their control over the presentation of evidence and witnesses to be called, including mental health expert witnesses and members of Kaczynski's family, in order to put on a full case of mitigation at the penalty phase. Kaczynski told the court that he was willing to proceed with his attorneys on this basis, and that "the conflict at least is provisionally resolved." In response to the court's query, Kaczynski also said that he did not want to represent himself. Jury selection was then completed and (to allow for the holidays) opening statements were set to begin January 5, 1998.

On January 5, Kaczynski told the court that he wished to revisit the issue of his relations with his attorneys. He said that he had learned from a preview of the opening statement the evening before (January 4) that counsel intended to present non-expert evidence of his mental state in the guilt phase. Clarke and Denvir

---

**4.** Fed.R.Crim.P. 12.2(b) provides:

If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall ... notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk.

**5.** As Kaczynski's January 21 letter to the court states, he agreed to his counsel's recommendation to defer calling the conflict to the court's attention so that his counsel could use their conflict "as a lever to persuade the U.S. Justice Department to agree to a conditional plea bargain that would allow Kaczynski to appeal his Motion to Suppress Evidence."

explained that they intended to introduce evidence of Kaczynski's physical state, living conditions, lifestyle, and writings to show the deterioration of his mental state over the 25 years he lived in Montana. Kaczynski also raised for the first time with the court the possibility that he might want to have Serra replace Denvir and Clarke. The district court continued the trial to January 8, and appointed Keven Clymo as "conflicts" counsel for Kaczynski.

Another hearing was held January 7. Kaczynski withdrew his January 5 request for Serra to represent him because Clymo had convinced him it would not be in his best interests; however, later the same day, Serra "faxed" a letter indicating that if Kaczynski's present lawyers were recused, he was willing to substitute in. Kaczynski told the court that he would like to be represented by Serra, but said: "As to the question of when he would be able to start, he stated that, of course, he will not be able to start trial tomorrow. He would need a considerable time to prepare." The court refused to allow Serra to take over because of the delay it would cause. After discussing Kaczynski's continuing differences with counsel over mental status evidence, the court also ruled that counsel could control the defense and present evidence of his mental condition over Kaczynski's objection. Again in response to a question from the court, Kaczynski said that he did not want to represent himself. He explained that "if this had happened a year and a half ago, I would probably have elected to represent myself. Now, after a year and a half with this, I'm too tired, and I really don't want to take on such a difficult task. So far I don't feel I'm up to taking that challenge at the moment, so I'm not going to elect to represent myself."

However, the next day (January 8), Kaczynski's counsel informed the court that Kaczynski wanted to proceed as his own counsel. Clarke explained that Kaczynski believed he had no choice, given presentation of a mental illness defense which he "cannot endure." Clarke also indicated that Kaczynski had advised her that he was prepared to proceed *pro se* that day, without delay. Both sides thought that a competency examination should be conducted, given defense counsels' view that his mental condition was Kaczynski's only viable defense. The court also noted that it had learned from the U.S. Marshals office that Kaczynski might have attempted suicide the night before. Accordingly, it ordered a competency examination, to be completed before ruling on the *Faretta* request. The trial was continued to January 22. A court-appointed psychiatrist examined Kaczynski and concluded that he was competent. All parties agreed on January 20 that this resolved the issue.

On January 21, Kaczynski again asked to represent himself.[6] The court denied the request on January 22, finding that it was untimely because it came after meaningful trial proceedings had begun and the jury had been empaneled. The court also found that Kaczynski's request to represent himself was a tactic to secure delay and that delay would have attended the granting of the motion given the complexity of the capital prosecution. Although Kaczynski did not request a continuance, the court found "it was impossible to conceive" that he could immediately assume his own defense without considerable delay for preparation of an adequate defense. This, in turn, would risk losing jurors and having again to go through the arduous process of selecting a new jury. The court also found that Kaczynski's conduct was

**6.** In a letter to the court, Kaczynski wrote:

Your Honor, I recognize that you are an unusually compassionate judge, and that you sincerely believe yourself to be acting in my best interest in seeking to prevent me from representing myself. In an ordinary case your course would be the most com-

passionate one, and the one most likely to preserve the defendant's life. But I beg you to consider that you are dealing with an unusual case and an unusual defendant and that preventing me from representing myself is *not* the most compassionate course or the one most likely to preserve my life.

not consistent with a good faith assertion of his right to represent himself, as he had long known of his attorneys' intention to present mental health evidence and had agreed on December 22 that they could do so at the penalty phase. Accordingly, the court concluded, Kaczynski's conflict with counsel turned solely on the moment when mental evidence would be presented. Finally, the court declined to exercise its discretion to permit Kaczynski to represent himself in spite of the untimely request, noting that to do so would result in Kaczynski's foregoing "the only defense that is likely to prevent his conviction and execution." [7]

Immediately after the *Faretta* request was denied from the bench, Denvir informed the court that Kaczynski would unconditionally plead guilty to both the California and New Jersey Indictments if the government would withdraw its notices of intent to seek the death penalty. (Kaczynski alleges that this condition was counsels' idea, not his.) A written plea agreement was entered into shortly thereafter, and the plea was taken by the court the same day.

Kaczynski was sentenced May 4, 1998 to four consecutive life sentences, plus 30 years imprisonment. He was ordered to pay $15,026,000 in restitution to his victims. Pursuant to the terms of the plea agreement, Kaczynski did not appeal.

On April 23, 1999, he filed a motion under 28 U.S.C. § 2255 seeking to vacate his conviction. The district court denied the motion without calling for a response or holding a hearing. It also denied a certificate of appealability. This appeal followed. We certified three issues: (1) whether Kaczynski's guilty plea was voluntary; (2) whether Kaczynski properly was denied the right to self-representation; and (3) whether a criminal defendant in a capital case has a constitutional right to prevent his appointed defense counsel

from presenting evidence in support of an impaired mental state defense at trial.

## II

■ We must first consider whether Kaczynski is barred from raising these claims in a collateral attack under § 2255, for the government argues that he procedurally defaulted by failing to raise them on direct appeal. *See Bousley v. United States,* 523 U.S. 614, 621, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) ("[E]ven the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review. Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations omitted). Kaczynski counters that the government waived *its* right to raise the issue of procedural default by having not done so in the district court. We disagree, because the district court summarily denied Kaczynski's § 2255 motion without giving the government an opportunity to be heard. As the government had no chance to argue default, we allow it to do so now. *Cf. United States v. Barron,* 172 F.3d 1153 (9th Cir.1999) (en banc) (government's failure to raise petitioner's procedural default in district court waives the defense in the absence of extraordinary circumstances suggesting that the omission should be overlooked).

■ Kaczynski acknowledges that his § 2255 motion raises only one claim—that his guilty plea was involuntary. Therefore, it is unnecessary to consider default with respect to his *Faretta* request or control over the mental state defense. These issues are only points upon which Kaczynski relies to show that his guilty plea was involuntary; he does not now (nor, as he also recognizes, could he) raise these claims independently. *See Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct.

**7.** The district court issued another order May 4, 1998, the day of sentencing, in which it further detailed its reasons for finding that Kaczynski was competent (not at issue on

appeal) and had not asserted his request for self-representation in a timely manner or consistent with a good faith invocation of the *Faretta* right.

1602, 36 L.Ed.2d 235 (1973) (criminal defendant who has admitted guilt in guilty plea may not thereafter raise independent claims relating to deprivation of constitutional rights that occurred prior to entry of plea).

■ Kaczynski argues that even if he did procedurally default his voluntariness claim, there were two causes to excuse it: first, that he waived the right to appeal in the plea agreement, and second, that his attorneys failed to consult with him about the possibility of direct appeal. The government maintains that the plea agreement waiver cannot justify bypassing direct review of his current claims, *see United States v. Pipitone*, 67 F.3d. 34, 39 (2d Cir.1995) (so holding with respect to agreement not to appeal a sentence within the guideline range), but it fails to argue how we can resolve counsels' possible ineffectiveness without a more fully developed record. *Bousley*, 523 U.S. at 621–22, 118 S.Ct. 1604; *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942) (per curiam) (coercion of plea appropriately raised on collateral review when facts relied on are dehors the record and not open to consideration and review on direct appeal). Accordingly, we cannot say that Kaczynski procedurally defaulted his involuntariness claim without cause.

### III

On the merits, Kaczynski contends that his plea was involuntary because he was improperly denied his *Faretta* right, or because he had a constitutional right to prevent his counsel from presenting mental state evidence. Even if neither deprivation suffices, still the plea was involuntary in his view because it was induced by the threat of a mental state defense that Kaczynski would have found unendurable.

■ It goes without saying that a plea must be voluntary to be constitutional. We review whether it was de novo, *United States v. Littlejohn*, 224 F.3d 960, 964 (9th Cir.2000), and the district court's findings for clear error. *United States v. Signori*, 844 F.2d 635, 638 (9th Cir.1988).

■ The general principles are well settled. To determine voluntariness, we examine the totality of the circumstances. *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986). A plea is voluntary if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). "[A] plea of guilty entered by one fully aware of the direct consequences ... must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In sum, "a guilty plea is void if it was 'induced by promises or threats which deprive it of the character of a voluntary act.'" *Sanchez v. United States*, 50 F.3d 1448, 1454 (9th Cir.1995) (quoting *Machibroda v. United States*, 368 U.S. 487, 493, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962)).

### A

Here, the plea was both written and oral. In the written agreement, Kaczynski admitted guilt on each of the offenses charged in both indictments and agreed to plead guilty "because he is in fact guilty"; waived his constitutional trial and appellate rights;[8] acknowledged he understood that by pleading guilty he was waiving these rights, that his attorney had explained both the rights and the consequences of his waiver, and that he freely

---

**8.** Specifically, the constitutional rights to a public and speedy trial; to a jury trial, presumption of innocence, and unanimous verdict; to confrontation of witnesses; to compulsory process; to the privilege against self incrimination; to appeal conviction after trial; and to the representation of counsel.

and voluntarily consented to the waiver; and agreed to waive all rights to appeal the plea and sentence including legal rulings made by the district court. In a separate, "approval" section of the plea agreement, Kaczynski affirms that he had reviewed the agreement with his attorneys, and that "I understand it, and I voluntarily agree to it and freely acknowledge that I am guilty of the crimes charged." Also, that: "No other promises or inducements have been made to me, other than those contained in this agreement. In addition, no one has threatened or forced me in any way to enter into this Plea Agreement. Finally, except as otherwise reflected in the record, I am satisfied with the representation of my attorneys in this case." [9]

During the Rule 11 colloquy, Kaczynski stated under oath that he was "entering [the] plea of guilty voluntarily because it is what [he] want[ed] to do"; that he was satisfied with his attorneys' representation, except for the mental defect defense as reflected in the record; and that no one had forced or threatened him to plead guilty. He stated that he was willing to proceed for sentencing with present counsel. The district court found that "the defendant is fully competent and capable of entering an informed plea and that his plea of guilty is a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense."

In its order denying the § 2255 motion, the court found that Kaczynski was aware of the basis on which his motion challenged the plea at the time of the plea colloquy, yet affirmatively answered the court's inquiry about whether he was entering his guilty plea voluntarily and responded negatively when asked whether anyone had attempted to force or threaten him to plead guilty. The court noted that Kaczynski specifically referred to the disagreement with his attorneys about a men-

tal status defense, but did not suggest in any way that he believed this disagreement affected the voluntariness of his plea. Further, the court found that Kaczynski showed no signs of anxiety or distress when he stated that he was voluntarily entering into the plea; that nothing about his demeanor indicated he endured any coercion; that he admitted the charges with no sign of reservation; and that his sworn plea statements were "lucid, articulate, and utterly inconsistent with his present claim that he did not voluntarily plead guilty."

■ We give "substantial weight" to Kaczynski's in-court statements, *United States v. Mims,* 928 F.2d 310, 313 (9th Cir.1991), and we accept the district court's findings as we are not firmly convinced they are wrong. Kaczynski was clearly aware of the consequences of his plea (and does not contend otherwise). The decision to plead guilty in exchange for the government's giving up its intent to seek the death penalty and to continue prosecuting him was rational given overwhelming evidence that he committed the Unabomb crimes and did so with substantial planning and premeditation, lack of remorse, and severe and irreparable harm. While Kaczynski does contend that his attorneys deceived him about their intentions to present a mental status defense, he knew what they planned to do before deciding to plead guilty, and he does not claim that he was persuaded to plead guilty by threats or misrepresentations of his attorneys, the government, or the court. Thus, there is no basis for concluding that his decision to plead guilty was influenced by improper threats, promises, or deceits, and no reason not fully to credit Kaczynski's sworn statements in the plea agreement, as well as during the plea colloquy, that he was pleading voluntarily.

■ This would normally end the inquiry, for being forced to choose between

---

9. There is no dispute this refers only to the disagreement about presentation of mental    state evidence.

unpleasant alternatives is not unconstitutional. *See Brady,* 397 U.S. at 750, 90 S.Ct. 1463. However, since the district court ruled on Kaczynski's § 2255 motion, we held in *United States v. Hernandez,* 203 F.3d 614 (9th Cir.2000), that the erroneous denial of a *Faretta* request renders a guilty plea involuntary.[10] We reasoned that wrongly denying a defendant's request to represent himself forces him "to choose between pleading guilty and submitting to a trial *the very structure* of which would be unconstitutional." *Id.* at 626. Because this deprives the defendant "of the choice between the only two constitutional alternatives—a plea and a fair trial," we concluded that a district court's improper *Faretta* ruling "imposed unreasonable constraints" on the defendant's decision-making, thus making a guilty plea involuntary. *Id.* at 627. Therefore, we must consider whether Kaczynski's plea was rendered involuntary on account of a wrongful refusal to grant his request for self-representation.

### B

■ Following *Faretta,* our court has developed the rule that "[a] criminal defendant's assertion of his right to self-representation must be timely and not for purposes of delay; it must also be unequivocal, as well as voluntary and intelligent." *Hernandez,* 203 F.3d at 620 (summarizing prior law).

Kaczynski argues that there must be an affirmative showing that he intended to delay the trial by asking to represent himself, and that none was made here. *See Fritz v. Spalding,* 682 F.2d 782, 784 (9th

Cir.1982). Rather, he asserts, the facts show that his purpose was to avoid the mental state defense. Kaczynski also contends that his *Faretta* request was timely, which we assume (without deciding) that it was for purposes of appeal.[11] This leaves only the question whether he had bona fide reasons for not asserting his right of self-representation until he did. In making this determination, a court may consider the effect of delay as evidence of a defendant's intent, along with events preceding the motion, "to determine whether they are consistent with a good faith assertion of the *Faretta* right and whether the defendant could reasonably be expected to have made the motion at an earlier time." *Id.* at 784–85.

■ We review the district court's factual findings for clear error, but we have not yet clarified whether denial of a *Faretta* request is reviewed de novo or for abuse of discretion. *See United States v. George,* 56 F.3d 1078, 1084 (9th Cir.), *cert. denied,* 516 U.S. 937, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995). We conclude that under either standard, the propriety of denying Kaczynski's request necessarily follows from the district court's finding that he asserted the right to represent himself as a tactic to delay trial proceedings and lacked bona fide reasons for failing to assert it before January 8, 1998.

The court found that Kaczynski "clearly and unambiguously permitted his lawyers to adduce mental status evidence at trial, and his complaints to the contrary, asserted on the day trial was set to commence, evidence his attempt to disrupt the trial

---

10. The government submits that *Hernandez* was incorrectly decided, but this, of course, is for the court sitting en banc, not for this panel, to say.

11. We have held that a *Faretta* request is timely if made "before meaningful trial proceedings have begun," *United States v. Smith,* 780 F.2d 810, 811 (9th Cir.1986), and have also held that a request is timely if made "prior to jury selection," and "before the jury is empaneled." *Moore v. Calderon,* 108 F.3d 261, 264 (9th Cir.1997); *United States v.*

*Schaff,* 948 F.2d 501, 503 (9th Cir.1991). The district court found that Kaczynski's first unequivocal request for self-representation was untimely because it occurred after the jury was empaneled on December 22, when strikes had been exercised and jurors were selected. The parties dispute whether the jury was "selected" or "empaneled" and whether "meaningful trial proceedings" could have begun before the jury was sworn, but we do not need to resolve these issues because we assume that Kaczynski's request was not untimely unless it was made for purposes of delay.

process." Further, the court found that although Kaczynski contended he made his January 8 request to represent himself only because he could not endure his attorneys' strategy of presenting mental status evidence in his defense, the record belied this contention because Kaczynski had authorized its use. The court also found that Kaczynski was well aware before January 8 that evidence of his mental status would be adduced at trial. In addition to the December 22 accord, Kaczynski was present during all but one day of the seventeen days of voir dire, during which the court observed that he conferred amicably with his attorneys while they openly and obviously selected jurors appearing receptive to mental health evidence about him. Finally, the court found that Kaczynski could not have immediately assumed his own defense without considerable delay, given the large amount of technical evidence and more than 1300 exhibits that the government intended to offer.

These findings are well grounded in the record, and support the court's conclusion that Kaczynski's request for self-representation was tactically made for dilatory purposes. Kaczynski knew from at least November 25 that he and his attorneys disagreed about a mental status defense, but he agreed on December 22 to let Denvir and Clarke proceed with both expert and lay testimony on his mental condition in the penalty phase so long as they presented no such expert testimony in the guilt phase. Although he knew then that evidence of his mental condition would be presented, Kaczynski expressly said that he did not want to represent himself. As he agreed to evidence of his mental state, it cannot be for *this* reason that he later invoked the right; otherwise, he could

have done so on December 22.[12] Instead, on January 5, when opening statements were supposed to start, Kaczynski renewed complaints about the mental status evidence his counsel planned to present in the guilt phase and mentioned to the court for the first time his interest in being represented by Tony Serra. This caused the trial to be continued to January 8. On January 7 Kaczynski said that he would like Serra to represent him, knowing that it would take Serra months to get ready. When the court refused to substitute Serra because of the substantial continuance that would be required, and ruled that appointed counsel could control the timing of when mental status evidence was introduced, Kaczynski repeated that he did not want to represent himself. However, that evening he may have attempted suicide and the next day (when the continued trial was set to start), Kaczynski informed the court that given presentation of a mental illness defense which he could not endure, he wanted to go forward as his own counsel. This triggered a competency examination and another delay in the start of trial, until January 22.

Kaczynski contends that he could not have been influenced by delay, given that he was incarcerated for the long haul in any event. However, the district court found that he was simultaneously pursuing strategies to delay the trial, to project a desired image of himself, and to improve his settlement prospects with the government. Kaczynski also argues that it should not matter whether he agreed to let evidence of his mental state be presented in the penalty phase, because the trial might never have gotten that far. We disagree, for Kaczynski never did—and does not now suggest—that he is actually

---

**12.** Although Kaczynski correctly points out that the district court had once indicated that he might have reasonably believed that his attorneys' withdrawal of the 12.2(b) notice meant that no lay evidence would be presented on his mental status during the guilt phase of the trial, the court subsequently found that, "after reflecting upon Kaczynski's general acuity, the content of the agreement itself, which was known to him, his awareness of

the questions his attorneys asked jurors during voir dire, and his expression and demeanor during voir dire that showed his clear approval of his lawyers' effort to use that defense to save his life, I became convinced that Kaczynski knew that his lawyers intended to offer mental status evidence during the guilt phase of trial." Order of May 4, 1998 at 18, n. 20 (citations to record omitted).

innocent or that there was any realistic chance that the jury would not unanimously find him guilty beyond a reasonable doubt.

■ As the events preceding Kaczynski's *Faretta* request show, he knew about and approved use of mental state evidence without invoking his right to represent himself. Accordingly, the court could well determine that Kaczynski's avowed purpose of invoking the right in order to avoid a defense he could not endure was not "consistent with a good faith assertion of the *Faretta* right," and that he "could reasonably be expected to have made the motion at an earlier time." *Fritz*, 682 F.2d at 784–85. Having found that the request for self-representation was for tactical reasons and not for any good faith reason other than delay, the court properly denied Kaczynski's *Faretta* request. His Sixth Amendment rights were not violated. Thus, his guilty plea was not, on this account, rendered involuntary under *Hernandez*.

## C

■ For essentially the same reasons, neither was Kaczynski's plea rendered involuntary on account of the threat of a mental state defense that he did not want presented. The government argues that Kaczynski's guilty plea waived his right to challenge the district court's ruling that his attorneys could put on mental state evidence at the guilt phase, and it unquestionably does. *United States v. Reyes–Platero*, 224 F.3d 1112, 1114 (9th Cir.2000) (unconditional guilty plea "cures all antecedent constitutional defects") (quoting *United States v. Floyd*, 108 F.3d 202, 204 (9th Cir.1997)). Kaczynski does not contend otherwise, but instead argues that he was coerced into pleading guilty by his counsel's insistence on a mental state defense, that his counsel deceived him in order to gain his cooperation with some such defense, and that he was induced to plead guilty by a choice (being unable to represent himself or to proceed without the mental state defense) that was constitutionally offensive.

Even if Kaczynski were misled by his counsel about the degree to which evidence of his mental state would be adduced in the guilt phase, he learned for sure what their plans were on January 4 when they previewed their opening statement for him and he does not allege, nor does the record show, that they in any way threatened or misled him with respect to the plea or its consequences. *Cf. Iaea,* 800 F.2d at 867–68 (attorney's threat to withdraw if defendant continued to refuse to plead guilty may, along with other factors, have coercive impact on voluntariness of plea). Kaczynski hypothesizes that counsel may have used mental state evidence as a threat to pressure him into an unconditional plea bargain as a means of saving him from the risk of a death sentence, but admits that this is speculative and that no proof for it is possible. Beyond this, he contends that the *Hernandez* rationale applies also to the right to proceed to trial without the presentation of mental state evidence. He points out that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal," *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and argues that evidence about mental status is of the same order of magnitude. The government, on the other hand, submits that it is equally "clear that appointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense." *United States v. Wadsworth,* 830 F.2d 1500, 1509 (9th Cir.1987); *New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 664, 145 L.Ed.2d 560 (2000) ("the lawyer has—and must have—full authority to manage the conduct of the trial") (quoting *Taylor v. Illinois,* 484 U.S. 400, 417–18, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). We need not decide where along this spectrum control of a mental defense short of insanity lies, because Kaczynski agreed that his counsel could control presentation of evidence and witnesses to be called (including expert witnesses and members of his family who would testify that he was mentally

ill) in order to put on a full case of mitigation at the penalty phase. Thus, as the district court found, Kaczynski's claim that his plea was involuntary due to his aversion to being portrayed as mentally ill is inconsistent with his willingness to be so portrayed for purposes of avoiding the death penalty. This leaves only the pressure that Kaczynski personally felt on account of his wish to avoid the public disclosure of evidence about his mental state sooner rather than later. We agree with the district court that this does not transform his plea into an involuntary act. *See Brady,* 397 U.S. at 749–50, 90 S.Ct. 1463.

Accordingly, as Kaczynski's guilty plea was voluntary and was not rendered involuntary on account of the wrongful denial of his *Faretta* request or because of anticipation of evidence about his mental condition, his habeas petition was properly denied.[13]

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

I disagree strongly with the majority's decision and regretfully must dissent.

This case involves the right of a seriously disturbed individual to insist upon representing himself at trial, even when the end result is likely to be his execution. It presents a direct clash between the right of self-representation and the state's obligation to provide a fair trial to criminal defendants, especially capital defendants. It raises the question whether we should execute emotionally disturbed people whose crimes may be the product of mental disease or defect and, if so, whether they should be allowed to forego defenses or appeals that might prevent their execution. In fact, it raises, albeit indirectly, the question whether anyone should be permitted to waive his right to contest his execution by the state if that execution might be unlawful.

The case of Ted Kaczynski not only brings together a host of legal issues basic to our system of justice, it also presents a compelling individual problem: what should be the fate of a man, undoubtedly learned and brilliant, who determines, on the basis of a pattern of reasoning that can only be described as perverse, that in order to save society he must commit a series of horrendous crimes? What is the proper response of the legal system when such an individual demands that he be allowed to offer those perverse theories to a jury as his only defense in a capital case—a defense that obviously has no legal merit and certainly has no chance of success? What should the response be when he also insists on serving as his own lawyer, not for the purpose of pursuing a proper legal defense, but in order to ensure that no evidence will be presented that exposes the nature and extent of his mental problems? The district judge faced these questions and, understandably, blinked. He quite clearly did so out of compassionate and humanitarian concerns. Nevertheless, in denying Kaczynski's request to represent himself, the district court unquestionably failed to follow the law. Notwithstanding the majority's arguments in defense of the district judge's actions, they simply cannot be supported on the ground he offered, or on any other ground available under the law as it now stands.

Whether Theodore Kaczynski suffers from severe mental illness, and which of the various psychiatric diagnoses that have been put forth is the most accurate, are questions that we cannot answer here. However, it is not now, nor has it ever been, disputed that under the governing legal standards, he was competent to waive his right to the assistance of counsel.[1] Therefore, whatever we may think about the wisdom of his choice, or of the doctrine

---

**13.** Given our disposition there is no need to reach Kaczynski's request for a different judge on remand.

**1.** The standard for measuring a defendant's competency to waive the right to counsel is

no different than the standard for measuring his competency to stand trial. *See Godinez v. Moran,* 509 U.S. 389, 397, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). In *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam), the Supreme Court

that affords a defendant like Kaczynski the right to make that choice, he was entitled, under the law as enunciated by the Supreme Court, to represent himself at trial.[2] A review of the transcript makes startlingly clear that, under the law that controls our decision, the denial of Kaczynski's request violated his Sixth Amendment rights. There is simply no basis for the district court's assertion that the request was made in bad faith or for purposes of delay. Because, as the majority acknowledges, the erroneous denial of a self-representation request renders a subsequent guilty plea involuntary as a matter of law,[3] I must respectfully dissent from the majority's holding that Kaczynski's plea was voluntary.[4]

## I.

By the time of his arrest in a remote Montana cabin on April 3, 1996, Ted Kaczynski had become one of the most notorious and wanted criminals in our nation's history. For nearly two decades, beginning in 1978, the "Unabomber"—so designated by the FBI when his primary targets appeared to be universities and airlines—had carried out a bizarre ideological campaign of mail-bomb terror aimed at the "industrial-technological system" and its principal adherents: computer scientists, geneticists, behavioral psychologists, and public-relations executives. Three men—Hugh Scrutton, Gilbert Murray, and Thomas Mosser—were killed by Kaczynski's devices, and many other people were injured, some severely.

In 1995, Kaczynski made what has been aptly described as "the most extraordinary manuscript submission in the history of publishing."[5] Kaczynski proposed to halt all his killings on the condition that major American newspapers agree to publish his manifesto, "Industrial Society and Its Future." The *New York Times* and *Washington Post* accepted the offer, and that most unusual document, with its "dream . . . of a green and pleasant land liberated from the curse of technological proliferation,"[6] revealed to the world the utopian vision that had inspired Kaczynski's cruel and inhumane acts. Among the readers of the manifesto was David Kaczynski, who came to suspect that its author was his brother Ted, a former mathematics professor at Berkeley who had isolated himself from society some quarter-century before. David very reluctantly resolved to inform the FBI of his suspicions, although he sought assurances that the government would not seek the death penalty and expressed his strong view that his brother was mentally ill. On the basis of information provided by David, the FBI arrested Kaczynski and, despite David's anguished opposition, the government gave notice of its intent to seek the death penalty.[7]

held that a defendant is competent if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "a rational as well as factual understanding of the proceedings against him." *Id.* at 402, 80 S.Ct. 788.

2. *See Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *United States v. Farhad,* 190 F.3d 1097, 1101–1109 (9th Cir.1999) (Reinhardt, J., concurring specially).

3. *United States v. Hernandez,* 203 F.3d 614 (9th Cir.2000).

4. Because I conclude that the denial of Kaczynski's right of self-representation rendered his plea involuntary, I do not consider his alternative argument that the plea was rendered involuntary by the court's ruling that his counsel, not he, would decide whether a mental-health defense would be offered in the guilt phase of his trial.

5. William Finnegan, *Defending the Unabomber,* The New Yorker, March 16, 1998, at 53.

6. Cynthia Ozick, *Quarrel and Quandary* 5 (2000).

7. That decision was not without controversy. Although the government made no explicit promise to David Kaczynski that it would not seek the death penalty, " '[s]ome FBI agents told (David) Kaczynski that Ted would be better off and could get help if he turned him in,' said one source. 'Some in the Justice Department feel that they owe David because of what the FBI said.' " Gary Marx, *U.S. Will Seek Death in Trial of Kaczynski: Prosecutors Reject Plea from Family of Unabomber Suspect,* Chi. Trib., May 16, 1997.

Following Kaczynski's indictment, Federal Defenders Quin Denvir and Judy Clarke were appointed to represent him. Attorney Gary Sowards joined the defense team some time later. All three are superb attorneys, and Kaczynski could not have had more able legal representatives. From the outset, however, Kaczynski made clear that a defense based on mental illness would be unacceptable to him, and his bitter opposition to the only defense that his lawyers believed might save his life created acute tension between counsel and client. That tension persisted, and periodically erupted, throughout the many months leading up to Kaczynski's guilty plea, and the dispute was not definitively resolved until Judge Burrell ruled on January 7, 1998, that Kaczynski's attorneys could present mental-health evidence even over his vehement objection. It was that ruling, Kaczynski maintains—and the record indisputably reflects—that compelled him to request self-representation the very next day as the only means of preventing his portrayal as a "grotesque and repellent lunatic." In doing so, Kaczynski was merely exercising the right that Judge Burrell had recognized he possessed the day before, immediately after he issued his controversial ruling that counsel, not client, would control the presentation of mental-health evidence.[8]

Whether Kaczynski's self-representation request was made in good faith, as Judge Burrell repeatedly stated on January 8, or whether it was a "deliberate attempt to manipulate the trial process for the purpose of causing delay," as Judge Burrell subsequently held when explaining his reason for denying the request, is the issue before us. Although the answer is absolutely clear from the record, it is helpful to set forth a number of colloquies that demonstrate that everyone involved—including counsel for both sides and the district judge—was fully aware that Kaczynski's request was made in good faith and not for purposes of delay. The record reveals that Kaczynksi's aversion to a mental-health defense was, indisputably, heartfelt, and that no one—least of all Judge Burrell—ever questioned Kaczynski's sincerity prior to the time the judge commenced formulating his January 22 ruling.

## II.

Kaczynski contends that he first learned on November 25, 1997 that his attorneys intended to present evidence that he suffered from major mental illness, specifically schizophrenia.[9] On that day, in open court, Kaczynski discovered that numerous psychiatric reports, the contents of which he had been assured would be privileged, had been released to the public without his consent. Although it is true, as the majority notes, that Kaczynski had previously been aware that his attorneys were planning to introduce some evidence that he might suffer from neurological problems— he had consented to the filing of a notice under Rule 12.2(b) of the Federal Rules of Criminal Procedure to leave open the possibility of introducing expert testimony on that point—he nevertheless believed that he had the right to prevent the mental-health experts who had examined him from testifying at his trial.[10]

**8.** The government agreed with Kaczynski that he, not counsel, had the right to decide whether mental-health evidence should be presented and warned the court of "grave appellate error" if it ruled otherwise.

**9.** Because this is a section 2255 motion and no hearing was held, we must take the facts as alleged by Kaczynski unless they are directly contradicted by the record. Most of the facts that determine the outcome of the question before us are, however, undisputed in the record.

**10.** Rule 12.2(b) provides: "If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall ... notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk...."

In his section 2255 motion, Kaczynski stated that his consent to the filing of the 12.2(b) notice was "reluctant"; that he consented "under pressure from the defense team"; and that his agreement was conditioned on assurance by counsel that the defense team "would make no use of 'disease' or 'defect,' but only of the 'condition' aspect of the Rule," and that the purpose of the notice was to allow psy-

Kaczynski cites to dozens of notes that he wrote to his attorneys in the weeks and months prior to November 25, 1997, in which he expressed, in the strongest terms, his unwillingness to present a mental-health defense at trial. For example, in June of 1997 he wrote: "I categorically refuse to use a mental-status defense." In October, he explained in a note to Sowards: "I am bitterly opposed to the development of a science of the human mind...." Kaczynski asserts that he was led to believe that "the defense would argue that the offenses [he] was alleged to have committed were a kind of self-defense against the 'intrusion' of industrial civilization into the wilderness of Western Montana." He submitted to psychiatric evaluations, he contends, only after receiving "false promises and intense pressure" from his attorneys, who understood that his primary concern was to "refute the image of him as mentally ill that was projected by the media with the help of his mother and brother." In May or June of 1997, Kaczynski wrote to his attorneys: "I would like to get *reliable* psychological data about myself before the public in order to counteract all this silly stuff about me that the media have been pushing." Even when Kaczynski began to suspect that his attorneys intended to use some mental-health evidence and testimony at his trial, he "had no idea they intended to portray him as suffering from major mental illness," and he still believed that all such evidence was privileged and could not be released without his approval.

When, on November 25, 1997, Kaczynski learned that defense experts had diagnosed him as suffering from paranoid schizophrenia, and that the results of those examinations had been released to the government and to the public, he felt "shock and dismay." In the courtroom on that

day, Kaczynski wrote to Denvir and Clarke:

Did Gary [Sowards] give that info to the prosecutors with your knowledge and consent? If you all assume responsibility for revealing what is being revealed now, then this is the end between us. I will not work with you guys any more, because I can't trust you....

This case is developing in a direction that I certainly did not expect. I was lead [sic] to believe that this was not really a "mental health" kind of defense, but that you would try to show that my actions were a kind of "self defense." Gary [Sowards] gave me the impression that we would use only Dr. Kriegler, and would use her only to show I would not "do it again."

In the weeks that followed, Kaczynski also wrote three separate letters to Judge Burrell in which he explained his conflict with his attorneys and sought replacement of counsel. However, Denvir and Clarke prevailed upon him to delay bringing the conflict to the attention of the judge while they were engaged in negotiations with the Justice Department aimed at allowing him to plead guilty conditionally while preserving his suppression issues for appeal.[11] When those negotiations failed, Denvir and Clarke agreed to deliver Kaczynski's letters to Judge Burrell, and they did so on December 18.

The letters reveal the depth of the rift that had developed between Kaczynski and his attorneys regarding the issue of mental-health evidence. The first letter, dated December 1, 1997 begins: "Last Tuesday, November 25, I unexpectedly learned for the first time in this courtroom that my attorneys had deceived me." Kaczynski explained that he had been assured by his attorneys that the results of psychiatric examinations that he reluctantly agreed to

---

chologist Julie Kriegler, "who did not seem to think that [Kaczynski] suffered from serious mental illness," to testify at his trial. There is no reason to doubt these facts and we are required, under the applicable rules, to assume that they are true.

**11.** Kaczynski's motion to suppress evidence seized from his Montana cabin had been denied by the district court.

undergo—and even the fact that he had been examined at all—would be protected by attorney-client privilege and would not be disclosed absent his approval. Moreover, he had been "led to believe that [he] would not be portrayed as mentally ill without [his] consent." Kaczynski insisted that he had initially been misled as to the nature of a "12.2b defense"—he had been assured that it was "only a legal device to enable a certain mental-health professional [Dr. Kriegler] whom I know and like to tell the jury what kind of person I am." He was never informed that the results of his psychiatric examinations would be released.

In a letter dated December 18, Kaczynski offered his reasons for objecting to a defense based on mental-health evidence:

> I do not believe that science has any business probing the workings of the human mind, and . . . my personal ideology and that of the mental-health professions are mutually antagonistic. . . . [I]t is humiliating to have one's mind probed by a person whose ideology and values are alien to one's own. . . . [Denvir, Clarke, and Sowards] calculatedly deceived me in order to get me to reveal my private thoughts, and then without warning they made accessible to the public the cold and heartless assessments of their experts. . . . To me this was a stunning blow . . . [and] the worst experience I ever underwent in my life. . . . I would rather die, or suffer prolonged physical torture, than have the 12.2b defense imposed on me in this way by my present attorneys.

Previous consent to such a defense was, Kaczynski contended, "meaningless because my attorneys misled me as to what that defense involved."

Kaczynski proposed three possible solutions: that his attorneys be prevented from using a "12.2b" defense; that he be permitted to represent himself, preferably with appointed counsel to assist him; or that new counsel be appointed for him. After receiving Kaczynski's letters, Judge Burrell ordered an ex parte hearing, to be held on December 22, during which Kaczynski's conflict with counsel would be explored. At that hearing, Kaczynski agreed to an accommodation, which he characterizes as "tentative,"[12] according to which Denvir and Clarke would withdraw the 12.2(b) notice (thereby precluding introduction of expert testimony about Kaczynski's mental state during the guilt phase of the trial), but would be permitted to introduce mental-state evidence in the penalty phase. Kaczynski insists that his understanding at the time was that the agreement would preclude the presentation of *any* mental-state evidence during the guilt phase of the trial, even though the rule (the text of which Kaczynski contends he never saw) applies only to *expert* testimony. Kaczynski's misunderstanding was reasonable; in fact, Judge Burrell shared it, as he later acknowledged:

> I agree with something Mr. Kaczynski said. He indicated that he assumed, when counsel with [sic] withdrew the 12.2(b) defense, that all such defenses would be withdrawn. That was my assumption too. But I recognize, as Mr. Kaczynski recognizes, that that's technically in error. But I felt the same way he felt. . . . And then later I thought since Mr. Kaczynski is not learned in the law, and I don't mean that disrespectfully, not to the extent that I hope I am, I assume that he would not realize that the mental status defense was not necessarily fully withdrawn with the 12.2(b)

---

**12.** Kaczynski's characterization is supported by the record of the hearing. In response to Kaczynski's statement to the judge that his preference would be to exclude attorney Gary Sowards (who was principally responsible for the preparation of mental-state evidence) from the case, Judge Burrell responded, in part: "Why don't we try it this way first, to

see if this works. And if you have difficulty with it, I think you know how to reach me." Later in the hearing, Kaczynski made the following statement: "On that basis, Your Honor, I'm willing to proceed with my attorneys. And I think the conflict is at least provisionally resolved."

notice being withdrawn. . . . I understand what Mr. Kaczynski was telling me, because I thought the same thing he thought.[13]

Immediately following the December 22 agreement, the parties exercised their peremptory strikes and the jury was selected. Kaczynski maintains that from December 22 through January 4, he believed that (1) his attorneys would not be permitted to introduce any mental-state evidence during the guilt phase of his trial, and (2) attorney J. Tony Serra—who had written to Kaczynski and offered to represent him without employing a mental-health defense but had subsequently withdrawn the offer of representation—was unwilling to serve as his counsel at trial. Kaczynski first learned of his attorneys' intention to present *non-expert* mental-state testimony at the guilt phase of his trial on the evening of January 4, 1998—the day before trial was to begin. Denvir and Clarke visited him at the jail that evening and read him their opening statement. Kaczynski declares that he was "horrified to learn that his attorneys planned to present extensive nonexpert evidence of severe mental illness in the guilt phase."

On the morning of January 5, Kaczynski informed Judge Burrell of his continuing conflict with counsel, and the judge appointed attorney Kevin Clymo as "conflicts counsel" to represent Kaczynski's interests. Proceedings were postponed until January 7. On that day, Judge Burrell ruled that Kaczynski's counsel could present mental-state testimony even if Kaczynski objected. Judge Burrell then offered Kaczynski the option of self-representation, warning: "I don't advise it, but if you want to, I've got to give you certain rights." At the time of the court's offer, Kaczynski declined to accept it, explaining that he was "too tired . . . [to] take on such a difficult task," and that he did not feel "up to taking that challenge at the moment." By then, according to his section 2255 motion, "Kaczynski was already contemplating suicide as the most probable way out of this cul-de-sac." Later that same day, the court was informed that Tony Serra would, after all, be willing to represent Kaczynski. Kaczynski promptly requested a change of counsel, but Judge Burrell denied the request on the ground that substituting counsel would require a significant delay before trial could commence.[14]

On January 8, Kaczynski decided to accept the court's offer of the previous day and informed the court that he wished to represent himself.[15] Kaczynski's counsel conveyed his request to the court with great reluctance:

> Your Honor, if I may address the Court, Mr. Kaczynski had a request that we alert the Court to, on his behalf—it is his request that he be permitted to proceed in this case as his own counsel. This is a very difficult position for him. He believes that he has no choice but to go forward as his own lawyer. It is a *very heartfelt reaction, I believe, to the presentation of a mental illness defense, a situation in which he simply cannot endure.*

Kaczynski's attorneys made clear that he was not seeking any delay in proceedings and that he was prepared to proceed pro se immediately. On that day, as before, Judge Burrell did not intimate that he perceived any bad-faith motive on Kaczyn-

---

**13.** Judge Burrell made those remarks on January 7, 1998. His subsequent explanation, offered two weeks later when he denied Kaczynski's self-representation request, that upon reflection he came to believe that Kaczynski always understood the true import of the withdrawal of the 12.2(b) defense, is difficult to reconcile with his own firm and unequivocal declaration that he, too, had misunderstood the agreement and that, in fact, he had misunderstood it in precisely the same way Kaczynski had.

**14.** Kaczynski does not challenge the court's denial of his request for substitution of counsel.

**15.** The night before, Kaczynski apparently attempted suicide, although the record shows that Judge Burrell was unaware of that fact until after the January 8 hearing was over.

ski's part. To the contrary, he made numerous comments demonstrating his belief that Kaczynski sought self-representation solely because of the conflict over control of the mental-health defense—in other words, solely because of his desire to prevent the introduction of evidence regarding his mental health. Each of the following statements was made on January 8, 1998, immediately following Kaczynski's assertion of his right to act as his own counsel:

THE COURT: And there's even another issue, which I think is perhaps the key issue. That issue involves who controls the mental status defense. It is my opinion that that's what this is all about.

[GOVERNMENT]: I think the issue today, when the defendant says he wants to represent himself, is the question of Faretta and—

THE COURT: He's only saying that, in my opinion, because he wants to control the mental status defense.

THE COURT:.... In my opinion, the defendant would not be asking to represent himself if he was in control of the mental status defense. That's my opinion.

THE COURT:.... I think the crux of the question centers on who controls [the mental status] defense. And I believe that Mr. Kaczynski has expressed the interest of representing himself because I told him he doesn't control that defense.

No one disputes that Kaczynski had a constitutional right to represent himself if, as the court plainly recognized, the assertion of his right was motivated by the dispute over the mental-state defense. It is therefore no surprise that Judge Burrell, who repeatedly acknowledged that Kaczynski's request was induced by a genuine aversion to the presentation of mental-health evidence, signaled his inclination to grant the request:

[M]y tentative opinion is that if he's ready to go now, I'm inclined to let him do that; if we've reached this point,

reached that point, assuming he's competent.... [I]f I ultimately decide Mr. Kaczynski's competent, which, frankly, that's my view at this very moment—and I mean competent to stand trial—if I decide that, knowing that he only wants to represent himself because of his dispute with trial counsel over the assertion of the mental status defense—knowing that, I would probably have to allow him to do that, if he's competent.

In fact, when the government tried to advise the court that it strongly believed that Kaczynski had the right to represent himself, the court reiterated its agreement with that view, subject only to the question of competency. The court repeatedly asserted that the key to the self-representation issue was whether Kaczynski was "competent," and did not even hint at the possibility of a bad-faith motive. Ultimately, Kaczynski's own attorneys called their client's competency into question, expressing the view that his efforts to waive what appeared to be his only meritorious defense attested to the need for a competency evaluation. At that point, all counsel (including the court-appointed conflicts counsel) and Judge Burrell agreed that Kaczynski should undergo a psychiatric evaluation to determine his competency to exercise his right to self-representation, and the next day the judge issued an order for the necessary medical examinations.

The competency evaluation would, of course, have been altogether unnecessary had Judge Burrell believed on January 8 that Kaczynski's request to represent himself was made in bad faith. The judge could simply have denied the request on that ground. Nevertheless, two weeks later, after Kaczynski had been determined to be competent by a government psychiatrist, Judge Burrell denied the self-representation request, characterizing it—in a manner that directly contradicted the numerous statements he had made at the prior proceedings—as a "deliberate attempt to manipulate the trial process for the purpose of causing delay."

It stretches the imagination to believe that at some point during the two weeks in

which Kaczynski was undergoing mental competency tests, initially suggested by Judge Burrell, the judge suddenly came to believe that he had been hoodwinked by Kaczynski from the start. Rather, as some of his later comments on the subject indicate (e.g., the trial would become a "suicide forum"), Judge Burrell became more and more appalled at the grotesque and one-sided spectacle over which he would be forced to preside were Kaczynski to conduct his own defense. He understandably developed a strong desire to avoid the chaos, legal and otherwise, that would have ensued had Kaczynski been allowed to present his twisted theories to a jury as his defense to a capital murder charge. Not only would such a trial have had a circus atmosphere but, in light of Kaczynski's aversion to mitigating evidence, it would in all likelihood have resulted in his execution. It is not difficult to appreciate, therefore, how the denial of Kaczynski's request for self-representation—regardless of the unquestionable legitimacy of the request—must have seemed the lesser evil.

## III.

It is impossible to read the transcripts of the proceedings without being struck by Judge Burrell's exceptional patience, sound judgment, and sincere commitment to protecting Kaczynski's right to a fair trial—and his life. Judge Burrell's commendable concern about preventing Kac-

zynski from pursuing a strategy that would almost certainly result in his execution is reflected most dramatically in statements made in connection with the judge's January 22, 1998 oral ruling denying Kaczynski's self-representation request. The judge observed that by abandoning a mental-health defense and proceeding as his own counsel, Kaczynski would be foregoing "the only defense that is likely to prevent his conviction and execution.... That ill-advised objective is counterproductive to the justice sought to be served through the adversary judicial system, which is designed to allow a jury to determine the merits of the defense he seeks to abandon." Judge Burrell was unwilling to permit Kaczynski to use the criminal justice system "as an instrument of self-destruction," explaining that "a contrary ruling risks impugning the integrity of our criminal justice system, since it would simply serve as a suicide forum for a criminal defendant." He contended, in effect, that society had an interest in preventing capital defendants from using the instrument of the state to commit suicide. As legal support for his reasoning, Judge Burrell cited Chief Justice Burger's *dissenting* opinion in *Faretta.*[16]

Nevertheless, Judge Burrell did *not* base his decision denying Kaczynski's *Faretta* rights on his views of the role of the criminal justice system in capital cases; he was not free to do so under controlling law.[17] Indeed, Judge Burrell did not sug-

---

**16.** Judge Burrell's reasoning regarding the integrity of the criminal justice system and its obligation to protect the rights of capital defendants is appealing, and has been eloquently expressed on other occasions by some of our most distinguished jurists. *See, e.g., Whitmore v. Arkansas*, 495 U.S. 149, 171–72, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (Marshall, J., joined by Brennan, J., dissenting) (careful review of capital cases "is necessary not only to safeguard a defendant's right not to suffer cruel and unusual punishment but also to protect society's fundamental interest in ensuring that the coercive power of the State is not employed in a manner that shocks the community's conscience or undermines the integrity of our criminal justice system"); *Gilmore v. Utah*, 429 U.S. 1012, 1019, 97 S.Ct.

436, 50 L.Ed.2d 632 (1976) (Marshall, J., dissenting) ("I believe that the Eighth Amendment not only protects the right of individuals not to be victims of cruel and unusual punishment, but it also expresses a fundamental interest of society in ensuring that state authority is not used to administer barbaric punishments.").

**17.** *See, e.g., Whitmore*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (states may execute a competent and willing defendant without any appellate review of the validity of the conviction and sentence); *Demosthenes v. Baal*, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (same). It is undoubtedly for this reason that in his lengthy written order of May 4 setting forth his reasons for denying Kaczyn-

gest that Kaczynski could be deprived of the right to represent himself if his desire for self-representation were sincere. Such a ruling would have conflicted with Supreme Court precedent holding that a defendant who is competent has the right to conduct his own defense. Because Kaczynski's psychiatric evaluation resulted in a declaration that he was competent, the only available basis for denying his request was to find that it was not made in good faith—but rather for the purpose of delay—even though the record squarely refuted that conclusion.[18]

There can be no doubt that Judge Burrell's admirable desire to prevent an uncounseled, and seriously disturbed, defendant from confronting, on his own, the "prosecutorial forces of organized society"[19]—in this case, three experienced

federal prosecutors aggressively seeking that defendant's execution—lay at the heart of his denial of Kaczynski's request for self-representation. A fair reading of the record provides *no* support for the finding that Kaczynski's purpose was delay. Instead, it leads to the inexorable conclusion that Kaczynski requested self-representation on January 8, 1998, *not* because he wished to manipulate the trial process, but because Judge Burrell's rulings of the previous day had ensured that his lawyers would present the mental-health defense that he found so abhorrent.[20] Yet it is easy to appreciate why, as one commentator has suggested, "[t]he judicial system breathed a collective sigh of relief when the Unabomber pled guilty."[21] Indeed, all the players in this unfortunate drama—all except Kaczynski, that is—had

ski's self-representation request, Judge Burrell made no mention of the societal interests he so forcefully and compassionately discussed when making his oral ruling.

18. Judge Burrell also found that Kaczynski's request was untimely as a matter of law, but that finding is also inconsistent with our case law, and the majority does not rely on it. Kaczysnki asserted his right of self-representation before the jury was sworn. In *United States v. Smith*, 780 F.2d 810 (9th Cir.1986), we held that a *Faretta* request is timely as a matter of law if "made prior to jury selection, *or* if made before the jury is empaneled, unless it is made for the purpose of delay." *Id.* at 811, 95 S.Ct. 2525 (citations omitted) (emphasis added). Here, the jury was selected but not empaneled. Therefore, the majority is correct to "assume that Kaczynski's request was not untimely unless it was made for purposes of delay." Maj. op. at 1122 n. 11. That, then, brings us back to the issue presented by this appeal: did Kaczynski seek to represent himself because of the reasons the record so clearly reflects, or because he was trying to delay his trial?

19. *United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984).

20. The majority makes much of Kaczynski's consent to the presentation of mental-health evidence in the penalty phase, asserting that because "he agreed to evidence of his mental state, it cannot be for *this* reason that he later invoked the right" of self-representation. Maj. op. at 1117. This conclusion cannot be squared with the record, which makes abun-

dantly clear that Kaczynski's aversion to mental-health evidence was genuine, and that his sincerity was unquestioned by any participant in the proceedings prior to Judge Burrell's January 22 ruling. Kaczynski explains that he acceded to the compromise allowing mental-state evidence in the penalty phase (in exchange for withdrawal of the notice permitting such evidence in the guilt phase) with "great reluctance" because he "believed he had no hope of getting anything better"; his attorneys had warned him that "new counsel would probably force on [him] the same kind of mental-status defense" that he objected to; "elimination of mental-status evidence from the guilt phase would have greatly reduced the amount of time that [he] would have to spend listening to a portrayal of himself as insane"; and he was under intense psychological pressure and "decided to get what he could while the getting was good"—i.e., the withdrawal of the 12.2(b) notice.

Moreover, excluding the mental-health evidence from the guilt phase might, under Kaczynski's view of the law, have resulted in its total exclusion from the trial proceedings. Kaczynski thought highly of the environmental defense (imperfect self-defense) he wished to offer. In Kaczysnki's mind, a jury *should* find him not guilty, because his acts were justified. Thus, as Kaczynski undoubtedly saw it, there might well never be a penalty phase.

21. Michael Mello, *The Non-trial of the Century: Representations of the Unabomber*, 24 Vt. L.Rev. 417, 444 (2000).

reason to celebrate Kaczynski's unconditional guilty plea. His attorneys had achieved their principal and worthy objective by preventing his execution. The government had been spared the awkwardness of pitting three experienced prosecutors against an untrained, and mentally unsound, defendant, and conducting an execution following a trial that lacked the fundamental elements of due process at best, and was farcical at worst. Judge Burrell, as noted, had narrowly avoided having to preside over such a debacle and to impose a death penalty he would have considered improper in the absence of a fair trial. It is no wonder that today's majority is not eager to disturb so delicate a balance.

The problem with this "happy" solution, of course, is that it violates the core principle of *Faretta v. California* [22]—that a defendant who objects to his counsel's strategic choices has the option of going to trial alone. Personally, I believe that the right of self-representation *should* in some instances yield to the more fundamental constitutional guarantee of a fair trial.[23] Here, the district court understood that giving effect to *Faretta*'s guarantee would likely result in a proceeding that was fundamentally unfair. However, *Faretta* does not permit the courts to take account of such considerations. Under the law as it now stands, there was no legitimate basis for denying Kaczynski the right to be his own lawyer in his capital murder trial.

## IV.

I do not suggest that the result the majority reaches is unfair or unjust. It is neither. I would prefer to be free to uphold the district judge's denial of Kaczynski's request on the basis of the societal interest in due process for all defendants, and particularly capital defendants. Unfortunately, I am not permitted by precedent to do so. Because I am bound by the law, I am also unable to vote to affirm on

the basis the district court relied on: that Kaczynski's request was made in bad faith. Thus, with much regret, I must conclude that Kaczynski's plea of guilty was not voluntary and that he was entitled to withdraw it. Accordingly, I most respectfully dissent.

---

**22.** 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

**23.** *See Farhad,* 190 F.3d at 1101–1109 (9th Cir.1999) (Reinhardt, J., concurring specially).